**Lloyd A. GOOD, Jr., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–442L.

United States Court of Federal Claims.

Aug. 22, 1997.

Richard R. Nageotte, Stafford, VA, for plaintiff.

Dorothy R. Burakreis, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant. William Baxter, United States Army Corps of Engineers and Sean Skaggs, United States Department of Interior, of counsel.

## OPINION

MEROW, Judge.

Plaintiff Lloyd A. Good Jr. alleges that the U.S. Army Corps of Engineers ("Corps") denial of his 1990 permit application to dredge and fill wetlands and access navigable waters gave rise to a taking under the Fifth Amendment of the U.S. Constitution entitling him to $2,500,000.00 in just compensation. This matter is now before the court on cross-motions for summary judgment on liability. The principal issues raised in those motions are whether the federal denial deprived plaintiff's property of all economic value and, if not, whether that denial interfered with reasonable investment-backed expectations.

Plaintiff claims that the Corps denial of his 1990 permit application pursuant to the Endangered Species Act ("ESA") of 1973, 16 U.S.C. §§ 1531–1543 (1994), deprived his property of all economic value, and that his claim therefore falls squarely within the *per se* takings rule of *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Plaintiff advances two main arguments in support of this *Lucas* claim. First, plaintiff maintains that any development of his property would violate the ESA, and that therefore the property must be maintained in its natural state. Second, plaintiff maintains that even if development would not violate the ESA, development pursuant to U.S. Fish and Wildlife Service ("FWS") recommendations would not be economically viable, and therefore has the same effect as an outright prohibition on development.

Plaintiff argues in the alternative that even if his claim does not fall within the *Lucas per se* rule, he had reasonable investment-backed expectations in his development plans, and therefore can demonstrate a taking under *Penn Central Transportation Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Defendant contends that plaintiff's claim fails under the *Lucas* "antecedent inquiry" which requires that plaintiff demonstrate title to the right claimed to have been taken. In particular, defendant argues that plaintiff could not derive any economically viable use from his property without obtaining access to navigable waters of the United States. Defendant maintains that since the federal navigational servitude reserves that right to the federal government, the only economically relevant property interest at issue here belonged to the federal government, not the plaintiff. Defendant also maintains that plaintiff's claim fails under this inquiry because he did not acquire a vested right in his development plans under Florida law.

Defendant argues in the alternative that the federal restrictions do not have any effect on the value of plaintiff's property because plaintiff cannot show a "reasonable probability" that such development would be permitted under state and county law.

Thus, defendant concludes, plaintiff can neither demonstrate that the federal denial caused any economic impact, nor frustrated reasonable investment-backed expectations under *Penn Central.*

It is decided that no taking occurred in this case. As discussed more fully below, although plaintiff has a property interest that is the proper subject of a takings claim, that claim does not fall within the *Lucas per se* rule. Contrary to plaintiff's contention, the ESA does not require that his property be left in its natural state. Further, the FWS restrictions on development imposed pursuant to the ESA do not deprive plaintiff's property of all economic value. The property retains value both for development, or for the sale of transferable development rights.

Plaintiff's claim also fails under *Penn Central* because the Corps denial did not interfere with reasonable investment-backed expectations. At the time of plaintiff's initial 1973 investment in his property, both the federal and state regulatory regimes at issue here imposed significant development restrictions on plaintiff's use of that property. Although plaintiff would otherwise be constructively charged with knowledge of those restrictions, plaintiff explicitly acknowledged those restrictions, and their potential to thwart development, in his contract for the purchase of the property. Later, when plaintiff began to invest in preparing the property for development in 1980, the regulatory regime had been further strengthened. Again, plaintiff acknowledged those restrictions, and their potential to thwart development, in the contract making his first major investment in that development.

Land development at both points in time was a highly regulated business, and plaintiff's sought uses for his property were subject to restriction or prohibition under this regulatory regime. While plaintiff was free to assume the investment risks involved after considering that regime, the Fifth Amendment does not require the federal government to act as his surety should that investment prove to be ill-taken. Accordingly, defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied.

## FACTS

"Sugarloaf Shores," the 40 acre property at issue in this case, is located on Lower Sugarloaf Key, Monroe County ("the county"), Florida. Approximately half of the county hosts a portion of Everglades National Park, established in 1947 to protect the marshes of the Everglades. The remaining half of the county consists of the Florida Keys, a string of islands off the southern tip of Florida designated in 1979 as a state area of critical environmental concern. Lower Sugarloaf Key is located approximately 15 miles northeast of Key West, the county seat and the employment center of the Keys.

Sugarloaf Shores consists of a total of 32 acres of wetlands, approximately 26 acres of which are locally rare salt marsh fringed with mangrove trees and 6 acres of which are freshwater sawgrass marsh.[1] These salt and freshwater wetlands are separated by 8 acres of upland located in the southwest corner of the property. Much of the property is periodically submerged by the tide from Upper Sugarloaf Sound, a navigable water of the United States and an Outstanding Florida Water. The property provides habitat for several endangered species, including the Lower Keys marsh rabbit, the mud turtle and the silver rice rat.

On April 18, 1973, plaintiff entered into a contract to purchase Sugarloaf Shores and several other properties on Lower Sugarloaf Key and nearby Saddlebunch Key. In that contract, plaintiff acknowledged that:

The Buyers recognize that certain of the lands covered by this Contract may be below the mean high tide line and that as of today there are certain problems in connection with the obtaining of State and Federal permission for dredging and filling operations.

Plf. Summ. J. Ex. 1 at 7. On October 8, 1973, plaintiff acquired Sugarloaf Shores and these other properties for a total cost of $2 million.[2] Plaintiff estimates that his basis in Sugarloaf Shores is $92,718.78, and alleges that he has spent approximately this amount in his effort to develop the property. The record reveals that the bulk of this investment took place after 1980.[3] Plf. Summ. J. Ex. 4.

In October 1980, plaintiff hired Keycology, a land planning and development firm, to obtain the county, state and federal permits necessary to proceed with the development of Sugarloaf Shores. According to that agreement, plaintiff sought to obtain the permits necessary to prepare the property for development, and then sell the property to another party for actual development.[4]

The agreement specifically provided that Keycology would be paid a fixed fee of $24,000.00 for its good faith effort to obtain those

---

1. "The term *wetlands* means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b) (1996).

2. Plaintiff and his mother acquired Sugarloaf Shores together with a nearby motel area and marina known as Sugarloaf Lodge, parcels adjacent to the motel, additional parcels on Lower Sugarloaf Key, as well as property on Saddlebunch Key, which was subsequently developed as a recreational vehicle park. Plaintiff inherited his mother's 30% interest in Sugarloaf Shores, together with her interest in these other properties, upon her death in 1975.

   Photographs of Sugarloaf Shores presented at a hearing before this court on November 20, 1996, revealed that none of the other properties involved in the 1973 transaction were adjacent to Sugarloaf Shores. Defendant has not contended that these other properties should be considered in this takings claim.

3. Plaintiff claims $3,800.00 in expenditures for the purchase fill and consulting services prior to 1974, but has only provided documentation for $2,900.00 of these expenditures. Between 1982 and 1990, plaintiff claims $60,743.70 in expenditures for consulting services and permits, but has only provided documentation for $56,439.48. Plaintiff also claims $36,013.25 in legal fees, real estate taxes and mortgage interest for the period from 1973 to 1994.

4. In July 1989, plaintiff contracted to sell Sugarloaf Shores to Patch Communications for $1,000,000.00. The deal was made expressly contingent upon plaintiff's ability to secure final major development approval from the county for improvements to Sugarloaf Shores. This agreement was canceled by its own terms a year later when plaintiff failed to obtain that approval within the time limit provided for in the contract. Plf. Summ. J. Ex. 53.

permits within two years, and an additional fee should those permits issue. The agreement further provided that the additional fee would be equal to one-third of the value that Sugarloaf Shores was increased above its undeveloped value. Plaintiff and Keycology set that undeveloped value at $350,000.00, and acknowledged that the property would be worth much more if the necessary permits for development could be obtained. Although Sugarloaf Shores was zoned for single family residential use and platted for a 76–lot development with canals, plaintiff and Keycology acknowledged that "obtaining said permits is at best difficult and by no means assured...." Def. Summ. J. Ex. 33.

### I. Early Federal Permits

Plaintiff, through Keycology, submitted his first permit application to the Corps in March 1981, as required by the Rivers and Harbors Act ("RHA") of 1899, 33 U.S.C. § 403 (1994), and the Clean Water Act ("CWA") of 1972, 33 U.S.C. § 1344 (1994), for the dredging and filling of navigable waters of the United States.[5] That permit was granted by the Corps in May 1983, and authorized plaintiff to fill approximately 7.4 acres of salt marsh and excavate another 5.4 acres of salt marsh.[6] In effect, the permit provided plaintiff with the federal authorizations necessary for his plan to prepare Sugarloaf Shores for a 54–lot residential subdivision, complete with a 48–slip marina providing deep water access to Upper Sugarloaf Sound. Based upon the environmental concerns of the county, plaintiff subsequently requested permission from the Corps to modify this permit. The Corps processed this request as a new permit, and issued that permit on January 6, 1984.[7]

Consistent with Corps regulations, both of these permits required that the work authorized by the permit be completed within five years. See 33 C.F.R. § 325.6 (1996). As those deadlines approached, however, plaintiff continued to experience difficulty obtaining the required state and county authorizations for his plan. In response to plaintiff's request that it extend his federal permits based upon these difficulties, the Corps gave the plaintiff two limited extensions while it considered whether plaintiff's 1983 and 1984 permits should be extended without change. The extensions maintained the validity of those permits, but prohibited plaintiff from commencing work until the Corps finished its evaluation.[8]

In the interval between the issuance of plaintiff's original permits and his request to modify those permits as the five year deadline approached, the Corps had revised its regulations to clarify environmental review standards and explicitly recognize the value of rare wetland types. See, e.g., Final Regulations for Controlling Certain Activities in Waters of the United States, 49 Fed.Reg. 39,478 (1984) (clarifying import of environmental permit review standards); Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed.Reg. 41,206 (1986) (impacts to rare local wetland types should be avoided). Based upon these changes, the Corps exercised its authority to deny plaintiff's request to reissue his existing permits without change,[9] and instead processed his request as a new permit application.

---

5. For work requiring a permit under both the RHA and the CWA, Corps regulations provide for the filing of a single permit application. 33 C.F.R. pt. 325, Appendix A.

6. Permit No. 81J–1101.

7. Permit No. 83G–2076.

8. Although plaintiff repeatedly characterizes the Corps treatment of his extension and modification requests as unreasonable, the record does not support this characterization. In his own correspondence with the Corps, plaintiff notes that these requests were based upon his inability to obtain the necessary state and county authori-

zations during the five year life of the federal permits. Plf. Summ. J. Ex. 46. Although the Corps had no legal obligation to grant those requests, see 33 C.F.R. § 325.6(d), it timely granted two extensions to plaintiff while it conducted the review required of it by law.

9. The regulations provide the Corps with the authority to modify, revoke or suspend any permit based upon, among other things, a change in circumstances, any objections to the activity authorized by the permit which were not considered previously, any changes in the statutory or regulatory authorities and the extent of investment the permittee has taken in reliance upon the permit. 33 C.F.R. § 325.7(a).

The Corps granted plaintiff a new permit on October 17, 1988.[10] While authorizing plaintiff to prepare Sugarloaf Shores for substantially the same development plan called for in his original proposal, it limited the fill for residences built in the salt marsh to 40 by 40 foot building pads. This modification reduced the overall wetland losses of plaintiff's proposal from 12.8 acres to 10.53 acres. The permit was set to expire on October 17, 1993.

## II. State and County Permits

At the same time that Keycology initiated the application process with the Corps, it began to pursue the state and county authorizations necessary to effect plaintiff's plan. This effort resulted in the issuance of a state dredge and fill permit on February 10, 1983. The commencement of work authorized by that state permit, however, was conditioned upon plaintiff obtaining the necessary county approvals.

On May 10, 1983, plaintiff sought county approval of the dredge and fill proposal approved by the federal and state permits. Upon reviewing plaintiff's plan, the county determined the plan was a "major development" under the county land use statute then in effect, and accordingly ordered that it be evaluated pursuant to that statute's "major development review" process. See Monroe County Code, Fla. ("MCC") ch. 6, art. VII (1985) (superseded 1986). This process required, among other things, a more rigorous environmental review than that required by the standard development approval procedure. See, e.g., MCC § 6–223(c)(1) (purpose of major development review to ensure development proceeds in harmony with

natural ecology and environmental resources of county), § 6–225 (requiring the submission of an environmental designation survey of property proposed for development), § 6–229 (requiring the submission of a community impact statement detailing the impact of development on public services and environmental quality).

At the time that plaintiff sought county development approval, however, a moratorium on the issuance of major development approvals was in effect.[11] Although plaintiff's proposal was a "major development," [12] he appealed this determination to the Monroe County Board of Adjustment. After the Board of Adjustment refused plaintiff's request to have his proposal processed pursuant to standard development review, plaintiff appealed to the Monroe County Commission. Without providing a rationale, the County Commission reversed the decision of the Board of Adjustment, and ordered the county to process plaintiff's dredge and fill application according to the standard review procedures.

Processing plaintiff's proposal according to these standard procedures, the county granted plaintiff a dredge and fill permit on July 13, 1984. On September 7, 1984, the county also granted plaintiff's application to amend the plat of Sugarloaf Shores to comport with the federal and state permits that had already been issued.

On September 10, 1984, the Florida Department of Community Affairs ("DCA") appealed both of these approvals to the Florida Land and Water Adjudicatory Commission ("FLAWAC").[13] Rejecting plaintiffs claim

---

10. Permit No. 87IPV–20805.

11. Moratoria were instituted by the county beginning at least as early as February 1982, and were intended to ensure that county review of development plans not already in the major development review pipeline would be adjudged pursuant to the new county land use and public facilities plans then in preparation. Monroe County Ordinance No. 025–1983 (prohibiting the issuance of major development approvals except in limited circumstances and referencing prior moratoria). See also Monroe County Ordinance No. 015–1983.

12. "A major development project shall be any existing and/or activity or use which reflects one

or more of the following identified characteristics ... (1) A subdivision as identified in the county plat filing ordinance and which contains five (5) acres or more land and/or water area." MCC § 622.

13. The DCA is Florida's land use planning agency. Among other things, the DCA recommends geographic areas for designation as Areas of Critical State Concern, reviews local development orders in those areas, and may appeal those development orders. See Florida Environmental Land and Water Management Act of 1972, Fla. Stat. §§ 186.001–.911, 380.012–.12 (1983 & Supp.1984).

that he had a vested right under Florida law to pursue his development plan notwithstanding the requirements of the major development review process, FLAWAC found that:

In 1973, Lloyd Good was familiar with regulatory restrictions on the use of wetland areas. As a Philadelphia attorney, he had practiced in wetland areas in New Jersey ... and ... knew that the concept of deadend canals at that time was not feasible. He had decided to amend the original plat (and change the development plan) even before he purchased Sugarloaf Shores ... because he believed that under existing environmental laws the platted deadend canals would not be permitted.

Def. Summ. J. Ex. 2. FLAWAC went on to hold that the county had erred when it failed to subject plaintiffs proposals to major development review, and ordered the county to evaluate plaintiffs proposals pursuant to that review process.[14] That order was entered on May 29, 1986.

While the DCA appeal was pending before FLAWAC, the county adopted a new comprehensive land use plan and new development regulations. Both the plan and regulations became effective July 29, 1986, two months after FLAWAC entered its order in the DCA appeal. While the major development statute established a procedurally rigorous environmental review, the new development authorities replaced procedure with substantive environmental standards of proscriptive import. The new authorities not only prohibited dredging to provide access for docking facilities, Monroe County 1986 Comprehensive Plan, Volume II at 205, but also prohibited the filling of salt marsh except where necessary to provide access to a parcel. Even fill for that purpose was limited to 10 percent of the overall salt marsh on a parcel. Monroe County Code, Fla. art. II § 9.5–345 (1986) ("land development regulations" or "LDRs").

All of plaintiff's different development proposals involved dredging to provide access to Upper Sugarloaf Sound, and the filling of salt marsh for the purpose of providing residential housing. Accordingly, because of the impact these new authorities would have on his development plans, it became critical for plaintiff to secure county review under the repealed major development statute. Claiming that he could not secure that review per FLAWAC's order, plaintiff filed suit in state court. In that suit, plaintiff alleged that the state had taken his property entitling him to just compensation, and that FLAWAC's order was an unreasonable exercise of police power which violated his due process rights.

Plaintiff settled the case by stipulation on October 22, 1987. The stipulation provided that plaintiff was entitled to have his applications for dredge and fill and plat amendments adjudged according to the repealed major development review statute. The stipulation also provided, however, that plaintiff's "future development relative to Sugarloaf Shores ... shall be governed by those provisions in effect as of the date of application for such future development." Plf. Summ. J. Ex. 41.

On June 23, 1989, plaintiff submitted his major development review application to the county, and received preliminary approval of his application on November 9, 1989. The major development review statute provided that this preliminary approval would lapse unless a proper final development review application were submitted within one year of the preliminary approval.[15] The preliminary approval notified plaintiff of several condi-

---

14. DCA appeals are first reviewed by hearing officer of the Division of Administrative Hearings of the Florida Department of Administration, Fla. Stat. § 120.57(1) (1983), who is empowered to make recommended findings of fact and conclusions of law. FLAWAC, which consists of the Governor and the Cabinet of the State of Florida, considers those findings and conclusions in arriving at a final order. Fla. Stat. §§ 120.57(1), 380.07. FLAWAC's final order specifically adopted the hearing officer's findings of fact and conclusions of law. Def. Summ. J. Ex. 3.

15. The statute defined a final development plan as a development plan that "conforms substantially to an approved preliminary development plan including all special conditions attached to the preliminary development plan approval." MCC § 6–222 (1985). The county resolution providing plaintiff with preliminary development approval similarly notes that the county "will consider an application for final approval upon submission of a proper application and evidence that the conditions listed above have been met." Plf. Summ. J. Ex. 56.

tions he would be required to satisfy in order to secure final major development approval.[16] Among those conditions was the requirement that plaintiff obtain a surface water management permit from South Florida Water Management District ("SFWMD").

Plaintiff filed an application with SFWMD on November 13, 1989. On May 31, 1990, SFWMD notified plaintiff that its staff recommended denial of his application. SFWMD staff noted that plaintiff had declined to alter his plans to mitigate impacts to wetlands, and had declined to place deed restrictions and conservation easements on those wetlands that would not be directly impacted by development. The staff also noted that the property provided habitat for the Lower Keys marsh rabbit and the mud turtle, two state-listed endangered species. Based upon these considerations, the staff concluded that they could not:

> provide a favorable environmental review for this project due to the unmitigated loss of wetlands, the loss of habitat for the endangered species within them and the lack of reasonable assurance that future unmitigated wetlands destruction will not occur due to the lack of the above-requested dedication.

Def. Summ. J. Ex. 8A.

In the face of this negative review, plaintiff requested that his application be removed from SFWMD's agenda. On September 17, 1991, plaintiff requested that SFWMD indefinitely table his application while he pursued a new permit from the Corps. After that time, plaintiff never reactivated his application. He did not otherwise obtain SFWMD approval for any development plan for Sugarloaf Shores.

Although plaintiff's preliminary development plan approval expressly required him to obtain the SFWMD permit in order to secure final development approval, plaintiff

filed for final development approval without the SFWMD permit on March, 7, 1990. Plf. Summ. J. Ex. 58. In its review of his final development submission, the county planning staff noted that plaintiff had not met the SFWMD condition and several of the other conditions set forth in the preliminary development approval. Based upon these inadequacies, the staff found that plaintiff's application was not a satisfactory final development submission, and did not therefore toll the one-year time limit plaintiff was required to meet in order to prevent his preliminary approval from becoming invalid. Plf. Summ. J. Ex. 65. Plaintiff filed for an extension of this time limit to maintain the validity of that preliminary approval.

While the county extended that time limit to May 9, 1991, plaintiff did not make any further application for final development approval. This failure caused plaintiff's preliminary development approval to lapse.[17] Accordingly, under the terms of his October 22, 1987 stipulation, plaintiff's future applications for development were subject to the law in effect at the time of application. The law at the time included the Monroe County 1986 Comprehensive Plan and its restriction on dredging, and the LDR restrictions on the filling of salt marsh.

### III. The 1990 Federal Permit Application

On June 14, 1990, plaintiff informed the Corps that because of state and county concerns with his development plan he was exploring a new plan for Sugarloaf Shores, and requested a conference with Corps personnel. Plaintiff subsequently submitted a new application to the Corps that reflected plaintiff's new plan to build 16 single family residences all within wetlands, along with a boat canal and tennis court. Although plaintiff's 1990 plan reduced the density of residential development compared to his 1988 proposal,

---

16. Most of the conditions prescribed measures that would lessen the environmental impact plaintiff's plan. The conditions addressed, for example, the preservation of wetlands not directly affected by development, the protection endangered wildlife, and the maintenance of existing mangrove trees. Monroe County Planning Commission Zoning Board, Resolution 18 (Nov. 9, 1989).

17. Although plaintiff implies throughout his filings with this court that he had obtained the necessary county approvals for his project, the record nonetheless clearly indicates that plaintiff did not obtain such approvals.

overall wetland losses were only reduced from 10.53 to 10.17 acres. And, although the marina was eliminated in the 1990 plan, plaintiff proposed to dredge a canal which would provide the residential lots with protected mooring and water access to Upper Sugarloaf Sound. The 1988 Corps permit was still valid at the time of plaintiff's 1990 application.

In the interval between the issuance of plaintiff's 1988 Corps permit and his application for the new permit in 1990, the Lower Keys marsh rabbit was listed as an endangered species under the ESA. 16 U.S.C. § 1533; Endangered and Threatened Wildlife and Plants; Endangered Status for the Lower Keys Rabbit, 55 Fed.Reg. 25,588 (June 21, 1990) (codified at 50 C.F.R. pt. 17).[18] The marsh rabbit was known to inhabit Sugarloaf Shores, and its listing as an endangered species placed obligations upon the Corps and the FWS in the 1990 permit review that they did not have when the earlier Corps permits were considered. In particular, the FWS took on a more significant role in the Corps permitting decision.

During the consideration of the early permit applications, the FWS played a limited role in the Corps permitting decision pursuant to the Fish and Wildlife Coordination Act ("FWCA") of 1934, 16 U.S.C. §§ 662–666 (1994). FWCA requires federal agencies proposing to alter any body of water to first consult with the FWS concerning the fish and wildlife impacts of the proposed action. 16 U.S.C. § 662(a). Although the agency engaged in the permitting action should give serious consideration to FWS recommendations, the agency is not required to follow those recommendations. *See, e.g., Sierra Club v. Alexander,* 484 F.Supp. 455 (N.D.N.Y.1980) (Corps may issue wetlands permit in face of FWS objection raised in the context of FWCA consultation), *aff'd,* 633 F.2d 206 (2d Cir.1980).

By contrast with its FWCA role, the ESA guarantees the FWS greater influence over the ultimate permitting decision where an endangered species may be affected by the federal action, and guarantees that species much greater protection.[19] First, pursuant to section 9 of the ESA, the marsh rabbit's endangered status made it illegal to "take" (*e.g.,* kill, harm, harass) an individual marsh rabbit. 16 U.S.C. §§ 1532(19), 1538(a)(1)(B). This take prohibition applies to any person and any act that kills or injures endangered wildlife, including significant habitat modification which has this effect 50 C.F.R. § 17.3 (1996); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). A person found to have knowingly violated this prohibition faces both civil and criminal penalties. 16 U.S.C. § 1540(a)–(b).[20]

Second, pursuant to section 7 of the ESA, the marsh rabbit's endangered status also obliged the Corps, after consulting with the FWS, to insure that the issuance of the wetlands permit would not place the continued existence of the species in jeopardy. The ESA consultation section specifically provides:

> Each federal agency shall, in consultation with and with the assistance of the ... [FWS], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species....

16 U.S.C. § 1536(a)(2). In the context of a section 7 consultation, the FWS will prepare a biological opinion to determine whether the federal action will cause jeopardy. The FWS

18. "The term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range...." 16 U.S.C. § 1532(6).

19. *See generally* Michael J. Bean, *The Evolution of National Wildlife Law* (1997).

20. By permit, however, the FWS may allow an otherwise prohibited take to occur so long as "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). An applicant for a so-called "incidental take permit" must submit a conservation plan to the FWS delineating the steps that will be taken to minimize and mitigate impacts to the species. The permit application and conservation plan are subject to public comment, and may be revoked if the terms are not complied with by the applicant. *See* 16 U.S.C. § 1539(a)(2).

will reach a jeopardy finding if it determines that the federal action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (1996).

If the FWS reaches a jeopardy finding, it will attempt to develop reasonable and prudent alternatives ("RPAs" or "development alternatives") to the proposed plan that would avoid causing jeopardy. 16 U.S.C. § 1536(b)(3)(A).[21] If the FWS identifies development alternatives that would avoid jeopardy, but would nonetheless result in the take of one or more individuals of the species, the FWS may permit that take, effectively exempting the action from section 9. 16 U.S.C. § 1536(b)(4), (*o*); 50 C.F.R. § 402.14(i)(5). Although the Corps retains the ultimate authority under the ESA to decide whether to require the applicant to modify his plans to comport with FWS RPAs, 50 C.F.R. § 402.15(a), the Corps must generally rely upon convincing evidence to reject those FWS determinations if it is to fulfill its ESA duty to insure that its permitting action will not cause jeopardy. *See Bennett v. Spear*, ―― U.S. ――, ――, 117 S.Ct. 1154, 1165, 137 L.Ed.2d 281 (1997).

On September 7, 1990, in its initial response to the Corps public notice of plaintiff's 1990 application, the FWS advised the Corps that plaintiff's property was inhabited by an endangered species, and proposed several conservation recommendations designed to protect the endangered rabbit. On October 9, 1990, in the face of the Corps determination that plaintiffs project would have no effect on the endangered rabbit and conflicting state information documenting the decline of the species, the FWS notified the Corps that it was initiating consultation under the ESA.

The FWS issued its biological opinion on February 19, 1991. In it, the FWS found that although the endangered rabbit had been in decline since the early 1980s, plaintiff's individual project would not be likely to jeopardize the continued existence of the species. The FWS did advise the Corps, however, that further species decline could trigger future restrictions on the issuance of wetlands permits. The FWS also advised the Corps that modifications to plaintiff's proposal or new information regarding endangered species could result in the reinitiation of ESA consultation.

Because the FWS reached a no jeopardy finding, it did not propose RPAs to plaintiff's 1990 development plan. The FWS did, however, recommend denial of the 1990 application pursuant to its distinct responsibilities under FWCA. This FWCA recommendation was based upon the impact plaintiff's plan would have upon the fish and wildlife that utilized the salt marsh for habitat, and the effect that pollution from plaintiff's development would have upon the near shore waters of Upper Sugarloaf Sound. The Corps was not legally required to follow this recommendation.

The FWS biological opinion also instructed the Corps to notify the plaintiff that he should not commence work under his 1988 permit. Since the plaintiff's 1988 permit had been issued before the rabbit had been listed as an endangered species, and reflected a different development plan from plaintiff's 1990 proposal, the FWS reasoned that its no jeopardy finding would not necessarily be applicable to the 1988 permit. Accordingly, the commencement of work under the 1988 permit could potentially violate the ESA.

On May 14, 1991, the Corps notified the FWS that plaintiff intended to pursue the plan reflected in the 1988 Corps permit.[22]

---

**21.** *FWS regulations define RPAs as:*

alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director [of the FWS] believes would

avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.02.

**22.** Plaintiff still had not secured the required state and county approvals to proceed with the plan reflected in the Corps 1988 permit.

The Corps also expressed its opinion that the 54–lot residential development with marina authorized by the 1988 permit would not jeopardize the continued existence of the endangered rabbit. The Corps did note, however, that the silver rice rat had been listed as an endangered species after the FWS biological opinion was issued. Endangered and Threatened Wildlife and Plants; Endangered Status for the Lower Keys Population of the Rice Rat (Silver Rice Rat), 56 Fed. Reg. 19,809 (April 30, 1991) (codified at 50 C.F.R. pt. 17). Because it did not have enough information about the silver rice rat, the Corps indicated that it did not know whether plaintiff's plan would have an effect on the species.

In response to this notification, the FWS initiated ESA consultation, and informed the Corps that it would prepare a new biological opinion evaluating the impact that plaintiff's 1988 plan would have on the endangered rabbit and rat. On December 18, 1991, the FWS released its new biological opinion. The new opinion evaluated the effect that both the 1988 and 1990 proposals would have upon the continued existence of both species.

In its earlier biological opinion on the endangered rabbit, the FWS no jeopardy determination noted that further species decline could trigger restrictions on development that would impact the endangered rabbit. In the interval between the issuance of this earlier biological opinion and the December 1991 opinion, new information showed that the species had declined in number. Further, other Lower Sugarloaf Key property

owned by plaintiff, which he operated as a private airport, was burned. This fire may have destroyed occupied marsh rabbit habitat.

Although the FWS sought permission to evaluate both Sugarloaf Shores and plaintiff's airport property to determine the status of the species on those sites, plaintiff refused permission. The FWS ultimately concluded that plaintiff's 1988 and 1990 plans would cause jeopardy to the endangered rabbit based upon the new information showing species decline, and presuming that the fire on plaintiff's airport property would have exacerbated this decline. Further, the FWS found that both of those plans would place the continued existence of the silver rice rat in jeopardy. Based upon these findings, the FWS recommended that the Corps deny the 1990 permit application, and modify the 1988 permit to reflect FWS RPAs.[23] These RPAs included restricting development to the upland portion of Sugarloaf Shores, limiting water access, and preventing the attraction of predators through deed and property maintenance restrictions.

Although FWS regulations exhibit a clear preference for receiving applicant input during the development of RPAs, 50 C.F.R. § 402.11(a)–(b), and provide the applicant with the right to review a draft of the biological opinion so that he may comment upon both the jeopardy determination and the proposed RPAs before they are finalized, 50 C.F.R. § 402.14(g)(5), plaintiff did not cooperate in this process.[24] *See also* Interagency

---

**23.** Plaintiff goes to some length to characterize the first FWS biological opinion recommending no development alternatives to his plan with its second biological opinion that did recommend development alternatives as inherently contradictory and suspect. Plaintiff, however, has failed to recognize that the first determination was made pursuant to FWCA, and that the second determination was made pursuant to the ESA.

As noted earlier, while the first FWS biological opinion found that plaintiff's plan would not jeopardize the existence of the endangered rabbit under the ESA, it did contain the FWCA recommendation to the Corps that plaintiff's application nonetheless be denied based upon broad fish and wildlife concerns. It was pursuant to FWCA and its mandate to consider all fish and wildlife resources that the FWS found that no develop-

ment alternative to plaintiff's plan could mitigate those broad impacts.

The second FWS biological opinion finding jeopardy to both the endangered rabbit and rat due to new information, and suggesting development alternatives that would mitigate the impact of plaintiff's development plan solely upon these species, was made pursuant to the ESA. This ESA determination recommending development alternatives based upon particular species concerns was not inconsistent with the FWCA finding that no development alternatives could avoid the broader impacts on all fish and wildlife resources.

**24.** It is not disputed that plaintiff made no such request, nor is it disputed that plaintiff refused to provide information and access to his property to conduct site evaluations during the agency con-

Cooperation: Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed.Reg. 19,926, 19,952 (June 3, 1986) ("Paragraph (g) provides for ... applicant review of the basis for any finding contained in draft biological opinions, including the availability of reasonable and prudent alternatives.").

Rather, by March 13, 1992 letter, plaintiff indicated his opposition to implementing the RPAs, and submitted the report of his environmental consultant and mammalogist, Dr. Larry Brown, contesting the FWS jeopardy finding. In his two page report, Dr. Brown found that Sugarloaf Shores was not suitable habitat for the marsh rabbit, that marsh rabbits were flourishing on plaintiff's airport property, and that the silver rice rat was not found on Lower Sugarloaf Key. Dr. Brown took a position directly contrary to the FWS by concluding "[i]t is my professional opinion that development of the 40 acre project site will not jeopardize the continued existence of the Lower Keys marsh rabbit or silver rice rat in any way." [25]

After receiving Dr. Brown's report, the Corps asked the FWS to reinitiate consultation to consider his findings. *See* 50 C.F.R. § 402.16(b). The FWS declined this request, restating its opinion that Sugarloaf Shores provided suitable habitat for the marsh rabbit and silver rice rat. Further, the FWS reasoned that, even assuming that the endangered rabbit was in fact flourishing on plaintiff's airport property, its jeopardy finding was still valid in light of new data showing further species population decline.

On March 17, 1994, the Corps denied plaintiff's 1990 application on endangered species grounds. The Corps also notified plaintiff that his 1988 permit had expired. In the denial letter, the Corps found that the RPAs were consistent with the project purpose in light of plaintiff's earlier plan to utilize upland to construct residential housing, that implementation of the RPAs would reduce wetland impacts generally, and that those RPAs would avoid causing jeopardy to the endangered rabbit and rat. Concurring in the FWS judgment, the Corps found that plaintiff's plan as proposed would jeopardize the continued existence of the endangered rabbit and rat, and therefore could not be authorized by the Corps under the ESA.

Plaintiff responded to the Corps denial by letter on May 27, 1994. In that letter, plaintiff newly asserted that *any* development of Sugarloaf Shores would violate the ESA. To support his position, plaintiff submitted a new report from Dr. Brown. In that two page report, Dr. Brown gave his opinion that the upland on Sugarloaf Shores "cannot be developed without violating the Endangered Species Act." Dr. Brown based this legal conclusion upon his view that all of Sugarloaf Shores was a "unit of natural habitat which is a functioning ecosystem, necessary for the continued survival of the Key's marsh rabbits which live on the site." [26]

sultation process that culminated in the December 1991 opinion and the RPAs.

**25.** It should be noted that, notwithstanding this finding, defendant's deposition of Dr. Brown revealed that he was not familiar with the meaning of the term "jeopardy" under the ESA:

> Q. Are you familiar with—Section Seven regulation promulgated by the Fish and Wildlife Service?
> A. No.
> Q. Then I take it you're not aware of the defined terms, then, set forth in those regulations?
> A. I'm not sure. What are the defining terms?
> Q. Well, in terms of 'jeopardy' or adverse effect. Are you familiar with the definitions in the regulations?
> A. Not the legal definitions. I have heard of those terms.

> Q. Do you understand there's a difference in meaning between 'jeopardy,' and 'adverse effect' under Section 7?
> A. I wasn't aware of that.
> Def. Summ. J. Ex. 117 at 55.

**26.** Although Dr. Brown concluded in his earlier March 1992 report that the development of Sugarloaf Shores would not cause jeopardy to the species, plaintiff also argued that the 1992 report nonetheless supported his new contention that development *would* cause jeopardy. In particular, plaintiff extrapolated from Dr. Brown's 1992 finding that preserving the uplands would increase the survival prospects of the 2–3 individual marsh rabbits he estimated might occupy Sugarloaf Shores, that development of the uplands as suggested by the FWS would jeopardize the continued existence of the species. Plaintiff here confuses the commands of section 9 and section 7 of the ESA.

In particular, a finding that one or more individuals of the species would be taken within the

On July 11, 1994, plaintiff filed this takings claim alleging, among other things, that the ESA required Sugarloaf Shores to be maintained in its natural state, thereby depriving the property of all economic value.

After plaintiff filed his takings claim, the Regional Solicitor for the U.S. Department of Interior asked the FWS to review the December 1991 biological opinion to determine whether development of Sugarloaf Shores consistent with the RPAs would still avoid jeopardy to the endangered rabbit and rat. The FWS responded that those RPAs were still viable, and that new information gathered since the December 1991 opinion indicated that additional RPAs might also be available.

On January 19, 1995, the FWS released a draft of additional RPAs that would be available for Sugarloaf Shores. The additional RPAs included permitting the construction of 8 waterfront homes in salt marsh with permanent boat moorings. According to the FWS, the impact of this additional development would be offset by new performance measures that had recently been successfully employed by the FWS on other projects involving the conservation of small mammals in the context of residential development.

Defendant filed a motion to stay plaintiff's takings claim on February 17, 1995, because the Corps had vacated its 1990 permit denial based upon the FWS draft. The Corps notified plaintiff of this action, and solicited his participation in the evaluation of those RPAs. On March 2, 1995, plaintiff filed his opposition to defendant's motion for stay, arguing that he considered the reevaluation process to be beyond the authority of the Corps and the FWS. Plaintiff again took the position that any development of Sugarloaf Shores would violate the ESA. On May 10, 1995, the FWS formally released a new biological opinion containing the additional RPAs.

## SUMMARY JUDGMENT STANDARD

Both plaintiff and defendant have moved for summary judgment arguing that no genuine issues of material fact surround the resolution of this claim, and that judgment may therefore be entered as a matter of law. RCFC 56(c). Material facts are those which will significantly affect the outcome of a suit under the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this case, since defendant's motion is granted, defendant is considered the moving party and plaintiff is considered the non-moving party.

The moving party bears the initial burden of demonstrating the absence of all genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In the case where the non-moving party bears the burden of proof at trial, the moving party can meet its initial burden by showing that there is an absence of evidence in the record necessary to prove an element of the non-moving party's case. *See id.* at 323, 106 S.Ct. at 2552–53. Once the moving party has made a sufficient showing, the burden shifts to the non-moving party to present facts evidencing a reasonable dispute to any material factual issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). While a material factual dispute must be viewed in a light most favorable to the non-moving party, that party must nonetheless "do more than simply show that there is some metaphysical doubt as to the material facts" in order to defeat a motion for summary judgment. *Id.*

## ANALYSIS

The takings clause of the Fifth Amendment to the U.S. Constitution provides "[n]or shall private property be taken for public use without just compensation." U.S. Const. amend. V. Early interpretations of the takings clause limited its application to actual government seizures of private property, and

---

meaning of section 9 does not require a jeopardy finding under section 7. Where an action complies with section 7 because it would not jeopardize the continued existence of the species, but would take individuals of the species, the FWS may effectively exempt that take from section 9 by permitting the take with mitigation. 16 U.S.C. § 1536(b)(4), (o); 50 C.F.R. § 402.14(i)(5).

claims that the clause applied to government regulation of the use of private property, even where a regulation caused a total or near total decline in economic value, were rejected on the theory that the right to use property is not absolute. *See, e.g., Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (ban on existing brickmaking operation to protect encroaching residential property owners causing substantial diminution in value not a taking); *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (prohibition on sale of alcohol which rendered brewery worthless not a taking).

The Supreme Court first advanced the proposition that the takings clause might be invoked to require the award of compensation where a government regulation had such a severe impact on property as to approximate an actual government seizure in *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The Court did not set out an analytical framework for determining when a regulation in fact went so far as to require compensation, however, until its 1978 decision in *Penn Central.* There the Court identified three factors to consider in analyzing a regulatory takings claim: the character of the government action, the economic impact of the regulation, and the extent to which the regulation interferes with reasonable investment-backed expectations. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659; *see also Concrete Pipe & Products, Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 641–47, 113 S.Ct. 2264, 2289–92, 124 L.Ed.2d 539 (1993). The Court added that these factors should be evaluated by "focusing on the uses the regulations permit," *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2663, and rejected as fallacious the "contention that a 'taking' must be found to have occurred whenever the land-use restriction may be characterized as imposing a 'servitude' on the claimant's parcel." *Id.* at 130 n. 27, 98 S.Ct. at 2662 n. 27.

Although the Court in *Penn Central* did not elevate the importance of any one factor

above another, it would later explicitly carve out two circumstances under which a single factor alone might determine the outcome of a takings case, and would implicitly recognize a third. The Court announced the first *"per se* rule" in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 441, 102 S.Ct. 3164, 3179, 73 L.Ed.2d 868 (1982), finding that a New York law requiring landlords to permit the permanent installation of cable TV apparatus gave rise to a taking. According to the Court, because the character of a government regulation that authorizes a permanent physical occupation of property so closely resembles an exercise of eminent domain, a taking should be found without reference to the other *Penn Central* factors.[27] *See also Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996); *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991).

The Court announced the second *per se* rule in *Lucas v. South Carolina Coastal Council,* finding that a regulation depriving real property of all economic value would give rise to a taking without considering the other *Penn Central* factors. 505 U.S. at 1029, 112 S.Ct. at 2900–01. The Court qualified this rule, however, with the exception that a total loss of value would not trigger a taking if "the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with...." *Id.* at 1027, 112 S.Ct. at 2899. This "antecedent inquiry" into limitations that inhere in the owner's title is made by reference to state property or nuisance law, *id.* at 1029, 112 S.Ct. at 2900–01, and federal law. *See id.* (federal navigational servitude).

Finally, although not characterized as a *per se* rule, in *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984), the Supreme Court resolved a regulatory takings claim solely under the reasonable-investment backed expectation factor of the *Penn Central* test, this time to find no takings liability. In that case, Monsanto argued that amendments to federal law providing for the disclosure of trade

---

**27.** The Court qualified this *per se* rule in *Nollan v. California Coastal Commission,* 483 U.S. 825, 831, 107 S.Ct. 3141, 3145–46, 97 L.Ed.2d 677 (1987), finding that a regulation which authorizes a permanent physical occupation of property as a valid condition to obtaining a development permit would not fall within the *Loretto per se* rule.

secrets submitted in government pesticide registration was a taking of those secrets. The federal law in effect at the time Monsanto submitted the trade information was silent on the issue of disclosure. *Id.* at 1008, 104 S.Ct. at 2875–76. Relying upon the highly regulated nature of the pesticide industry, the Court found that Monsanto did not have a reasonable investment-backed expectation that their property would be protected, and rejected the claim. *Id.* at 1013, 104 S.Ct. at 2878.

## I. Plaintiff's Property Interest

As noted above, where a plaintiff is able to demonstrate that a government regulation totally deprives property of all economic value, a taking will be found unless the proscribed use interests inhere in the landowner's title. *Lucas,* 505 U.S. at 1027, 112 S.Ct. at 2899; *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995). Defendant maintains that, even assuming plaintiff could show that the government limitations here caused such a total deprivation, those limitations inhere in plaintiff's title. In particular, defendant argues that plaintiff could not derive any economically viable use of his property without obtaining access to navigable waters of the United States. Defendant concludes that since the federal navigational servitude reserves that right to the federal government, all economically relevant limitations on plaintiff's use of Sugarloaf Shores inhere in his title, and are therefore not the proper subject of a takings claim. In the alternative, defendant asserts that limitations on the development of Sugarloaf Shores inhere in plaintiff's title because he failed to acquire a

vested right in his development plans under Florida law.

### a. The Navigational Servitude

The Commerce Clause, U.S. Const. art. 1, § 8, cl. 3, grants the federal government the power and duty to regulate the navigable waters of the United States. This power has been interpreted as bestowing upon the federal government a dominant estate in navigable waters below the mean high water mark ("MHWM") and the lands underlying them, *United States v. Chicago, Milwaukee, St. Paul & Pac. R.R.,* 312 U.S. 592, 596, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941); *Scranton v. Wheeler,* 179 U.S. 141, 163, 21 S.Ct. 48, 57, 45 L.Ed. 126 (1900); *Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1108 (Fed.Cir.1992), and may be asserted by the government to protect the public interest in navigable waters. *See, e.g., United States v. Ashland Oil and Transp. Co.,* 504 F.2d 1317 (6th Cir.1974) (interests protected by servitude include protecting quality of navigable waters).

This federal "navigational servitude" inheres in a private landowner's title, and subordinates his interests to those of the federal government. *See Lucas,* 505 U.S. at 1029, 112 S.Ct. at 2900–01; *M & J Coal,* 47 F.3d at 1153; *Owen v. United States,* 851 F.2d 1404, 1407 (Fed.Cir.1988). This limitation imposed by the servitude has been applied to deny a regulatory takings claim where the federal government proscribes the dredging and filling of submerged lands below the MHWM, *Marks v. United States,* 34 Fed. Cl. 387, 403 (1995), *aff'd,* 116 F.3d 1496 (Fed.Cir.1997),[28] and deprives a private landowner of land

---

**28.** Although plaintiff claims that he did not propose to conduct activities below the MHWM, his 1990 Corps application clearly indicates that he proposed dredging below the MHWM. This activity would fall within the navigational servitude held by the United States, and could likely be prohibited without compensation due to that predominant federal interest. Plaintiff attempts to avoid this conclusion by arguing that dredging to provide boating access is a "passive" use which does not fall within the interests protected by the servitude, relying upon *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

In *Kaiser,* the Supreme Court found that the servitude would not defeat a takings claim where the government required public access to a private pond made navigable through private investment. The case turned upon the fact that the government sought to provide public access to a formerly private area, and the importance of the right to exclude others from private property. *Id.* at 179, 100 S.Ct. at 392–93. It did not turn upon a determination that public access was a passive use of the navigable waters not within interests protected by the servitude. The Court acknowledged that the servitude could be applied to prohibit dredging without raising takings concerns. *Id.* at 180, 100 S.Ct. at 393.

values derived from access to navigable waters. *U.S. v. Rands,* 389 U.S. 121, 123–27, 88 S.Ct. 265, 266–69, 19 L.Ed.2d 329 (1967); *Owen,* 851 F.2d at 1410. Accordingly, defendant contends here that any value Sugarloaf Shores derives from access to Upper Sugarloaf Sound may not be attributed to plaintiff for the purposes of establishing takings liability.

■ Plaintiff responds with the argument that section 111 of the Rivers and Harbors Act abrogates the servitude and the *Rands* rule, and requires that such values be attributed to plaintiff. Section 111 provides:

> In all cases where real property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, the compensation to be paid for real property taken by the United States above the normal high water mark of navigable waters of the United States shall be the fair market value of such real property based upon all uses to which such real property may reasonably be put, including its highest and best use, any of which uses may be dependent upon access to or utilization of such navigable waters.

33 U.S.C. § 595a (1994).

While section 111 modifies the *Rands* rule in some condemnation cases, the provision does not abrogate the navigational servitude generally, or provide compensation for economic impacts attributable to the *regulation* of navigable waters. *See United States v. 30.54 Acres of Land,* 90 F.3d 790, 796 (3d Cir.1996) (dismissing regulatory taking counterclaim in condemnation case on ground that prohibition on existing use below the MHWM falls within navigational servitude). The legislative history of section 111 provides that it "makes no change in existing law" concerning the application of the navigational servitude. H.R.Rep. No. 1665, 91st Cong.2d Sess. 31 (1970). Further, even if it were appropriate to apply section 111 in a regulatory context, the section would be inapplicable here because the federal limitations do not totally restrict plaintiff's use of Sugarloaf

Shores. Section 111 provides that in cases of partial takings, no depreciation in the value of remaining real property shall be paid the landowner. *See* 33 U.S.C. § 595a.

■ Although defendant is correct that the navigational servitude reserves land values derived from proximity to navigable waters to the federal government, defendant has nonetheless failed to demonstrate that the servitude defeats plaintiff's takings claim. Defendant relies entirely upon plaintiff's deposition testimony, and the affidavit of his real estate agent stating that residential lots lacking water access would not be marketable, to support its argument that the servitude defeats this claim. More particularly, defendant extrapolates from this testimony that plaintiff has conceded that lack of water access would deprive Sugarloaf Shores of all economic value. It cannot be said that plaintiff's statements relate strictly to values reserved to the federal government pursuant to the navigational servitude. Accordingly, taking the facts most favorably for plaintiff, defendant has not shown that all economically relevant limitations on plaintiff's use of Sugarloaf Shores inhered in his title.

#### b. *Plaintiff's Property Interest under Florida Law*

Defendant argues in the alternative that even if plaintiff could demonstrate that the federal limitations caused a total loss of value, his takings claim would fail because he did not have a property right under Florida law to develop Sugarloaf Shores. For support, defendant points to the fact that plaintiff did not secure a vested right under state law in his development plan for Sugarloaf Shores. In the alternative, defendant argues that plaintiff had no property right in development because his property interest in Sugarloaf Shores was conditioned by state legislation regulating land use and dredge and fill activities.

■ Under Florida statutory and common law, a developer may obtain a vested right to pursue a particular development plan. A vested right may be acquired where the developer can show that he has: (1) substantially changed position, (2) in good

faith reliance, (3) upon some act or omission of the government, such that it would be highly inequitable to destroy the acquired right. *Dade County v. United Resources,* 374 So.2d 1046, 1050 (D.C.A. 3d Fla.1979); Fla. Stat. Ann. § 380.06(20) (West 1988) (codifying vested rights procedure). Plaintiff did not acquire a vested right in his development plans for Sugarloaf Shores.[29]

■ Contrary to defendant's contention, however, the presence or absence of a vested right in a given development scheme is not determinative of a takings claim. The failure of plaintiff to have secured such a vested right simply demonstrates that he has not secured a right to pursue a particular plan. It does not by itself mean that plaintiff has no right to pursue development. Similarly, even if plaintiff were able to demonstrate the existence of such a vested right under state law, a federal restriction on that state right would not demonstrate the federal restriction to be a taking. *See, e.g., Corn v. City of Lauderdale Lakes,* 95 F.3d 1066, 1073 (11th Cir.1996) (denial of permission to build project to which developer holds vested right does not by itself establish takings liability).

■ Defendant argues in the alternative that state legislation regulating land use and dredge and fill activities deprives plaintiff of any property right in development. Defendant has not demonstrated, however, that the limitations at issue here and reflected in this state legislation have their origin in the background principles of Florida's nuisance and property law. *See Lucas,* 505 U.S. at 1029,

112 S.Ct. at 2900–01 (regulations that deprive property of all economic value cannot be newly legislated without compensation but must originate in background principles of the state property or nuisance law).[30]

## II. Lucas Per Se *Taking*

Where a plaintiff can demonstrate that the restriction at issue does not inhere in his title and totally deprives property of all economic value, he is entitled to judgment under the *per se* takings rule of *Lucas.* In support of his *Lucas* claim, plaintiff argues that the ESA requires him to maintain Sugarloaf Shores in its natural state, and that this requirement deprives the property of all economic value. In the alternative, plaintiff argues that even if the development of Sugarloaf Shores pursuant to the FWS RPAs would not violate the ESA, such development is not economically viable, and therefore has the same effect as an outright prohibition on use. Plaintiff has failed to establish either proposition. The ESA does not require plaintiff to maintain Sugarloaf Shores in its natural state, and the FWS restrictions imposed on development pursuant to the ESA do not deprive the property of all economic value.

### a. *Legal Requirements of the ESA*

■ Plaintiff's *Lucas per se* takings claim that the ESA requires Sugarloaf Shores to be maintained in its natural state is based upon two erroneous legal conclusions drawn

---

**29.** Plaintiffs vested rights claim was rejected by FLAWAC in its May 29, 1986 order. Although plaintiff claims he filed a vested rights application with the county on August 8, 1985, the only evidence offered by plaintiff that such an application was ever filed is his affidavit and a vested rights application that does not bear evidence that it was ever received. In any case, plaintiff does not produce any evidence that such application was approved, and thus that a vested right was granted. Plaintiff's implicit claim that he acquired a vested right by virtue of the zoning in place at the time of purchase is also without merit. *See City of Miami Beach v. 8701 Collins Ave.,* 77 So.2d 428, 430 (Fla.1954).

**30.** It should be noted, however, that the Florida Supreme Court has held that a landowner has " 'no absolute and unlimited right to change the essential natural character of his land so as to

use it for a purpose for which it was unsuited in its natural state and which [injures] the rights of others.' " *Graham v. Estuary Properties Inc.,* 399 So.2d 1374 (Fla.1981) (quoting *Just v. Marinette County,* 56 Wis.2d 7, 201 N.W.2d 761, 768 (1972)), *cert. denied sub nom., Taylor v. Graham,* 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). While *Graham* establishes a common law basis for limitations on wetland destruction, the scope of those limitations under Florida common law are somewhat unclear. The reference in *Lucas* to state common law rules of property and nuisance has provoked new scholarly interest in divining the scope of those limitations. *See generally* Fred P. Bosselman, *Limitations Inherent in the Title to Wetlands at Common Law,* 15 Stan. Envtl. L. J. 247 (1996) (describing the significant restrictions on wetland destruction at English common law).

from the FWS finding that Sugarloaf Shores provides habitat for the marsh rabbit,[31] and his consultant's finding that development would result in the take of individual marsh rabbits. More particularly, plaintiff maintains that these findings demonstrate that development would violate the section 9 take prohibition, and cause jeopardy to the species under section 7. Accordingly, plaintiff concludes, he must maintain Sugarloaf Shores in its natural state in order to avoid violating these provisions of the ESA.

Neither legal conclusion is correct. First, the take of individual rabbits may be permitted under an exemption to the section 9 take prohibition. Second, the take of individual rabbits does not require a finding under section 7 that the species continued existence will be jeopardized.[32]

Plaintiff's first legal conclusion that the take of individual rabbits would be prohibited under the ESA fails to recognize the exemptions to that prohibition. Those exemptions were added to the Act in 1982 to resolve precisely the tension between section 7 and section 9 that plaintiff seizes upon to support his *Lucas* claim. As Congress explained in the legislative history to those amendments:

> Another concern raised by industry was that of resolving conflicts between Section 7 and Section 9. After complying with the rigorous demands of the Section 7 consultation process, the applicant or Federal agency receives no assurance that any incidental and unintentional takings contemplated under a Section 7 consultation will not be prosecuted under Section 9 which prohibits any taking. There are also situations where the unintentional taking may occur on private lands owned by a developer who has no need of a Federal permit or license to conduct their activities but, nevertheless, they are subject to the taking prohibitions of Section 9.

H.R.Rep. No. 97–567, at 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2815; *see also* H.R. Conf. Rep. No. 97–835, at 27, *reprinted in* 1982 U.S.C.C.A.N. 2860, 2868 (adopting the House provision).

In order to resolve this problem, Congress created two complimentary exemptions from the section 9 take prohibition:

> In order to meet these two different concerns, the Committee tailored two similar provisions. For the applicant who consults with the Secretary under the Section 7 process, the Secretary shall provide him with a written statement on what permissible incidental taking may occur. For private land owners, the Committee designed a solution through the permit provisions of

**31.** Plaintiff repeatedly refers to the FWS December 1991 biological opinion as "designating" Sugarloaf Shores as habitat for the marsh rabbit. This characterization creates the false impression that Sugarloaf Shores had acquired special legal status under the ESA. Under the ESA, the FWS is generally required to designate critical habitat at the same time the species is listed. 16 U.S.C. § 1533(b)(6)(C). "Critical habitat" are those areas that FWS determines possess the physical or biological features that are essential to the listed species conservation, and which need special management or protection to serve that function. 16 U.S.C. § 1532(5)(A). Where critical habitat has been designated, agency consultations must consider not only actions that might affect the listed species, but also actions that are likely to result in the destruction or adverse modification of this designated habitat. 16 U.S.C. § 1536(a)(2).

The FWS did not designate critical habitat for either the endangered rabbit or rat. 55 Fed.Reg. at 25,590 (endangered marsh rabbit), 56 Fed. Reg. at 19,813 (endangered silver rice rat). Accordingly, plaintiff's allusion to this designation is devoid of substance. Sugarloaf Shores was not so designated, and did not have this special status.

**32.** In order to bring a takings claim before this court, plaintiff must concede the validity of the agency action that is the subject of his claim. This jurisdictional requirement stems from the fact that the "[t]he Tucker Act suit in the Claims Court is not ... available to recover damages for *unauthorized* acts of government officials." *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898 (Fed.Cir.1986) (emphasis added), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *see also Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed.Cir.1993). Defendant argues that this portion of plaintiff's *Lucas* claim is not within the court's jurisdiction, see 28 U.S.C. § 1491(a)(1), because it effectively challenges the scientific validity of the FWS determinations. In response, plaintiff concedes that this inquiry would be improper, and asserts that he does not challenge the validity of FWS scientific determinations, but rather the legal conclusions drawn from those determinations. In accord with plaintiff's concession, only the legal conclusions drawn from those FWS determinations were considered here.

Section 10 by authorizing the Secretary to issue permits to individuals who demonstrate that the taking of an endangered species will be incidental to, and not the purpose of, the lawful activity they will perform. H.R.Rep. No. 97–567, at 15, 1982 U.S.C.C.A.N. at 2815. Accordingly, the 1982 amendments to the ESA provided that the FWS may permit a take in the context of section 7 actions, 16 U.S.C. § 1536(b)(4), (*o* ), and may permit a take in the private context. 16 U.S.C. § 1539(a). *See, e.g., Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir.1995) (incidental take in private context); *Center for Marine Conservation v. Brown*, 917 F.Supp. 1128, 1147 (S.D.Tex.1996) (incidental take in section 7 context).[33]

Plaintiff's second legal conclusion that the take of individual rabbits requires a jeopardy finding mistakenly equates the standards of section 7 and section 9. As noted earlier, jeopardy will be found where the issuance of the permit would "reasonably be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. While a take of individual endangered marsh rabbits under this definition could support a jeopardy finding if the take would appreciably reduce the likelihood of survival and recovery of the species, a take of individual rabbits

does not *legally require* a finding of jeopardy under section 7. If plaintiff's interpretation were correct, the necessary predicate for the invocation of the ESA exemption for incidental takings, i.e., that the take not cause jeopardy, *see* 16 U.S.C. § 1536(b)(4)(B); 50 C.F.R. § 402.14(i), would never be satisfied, rendering the exemption a nullity.

Here, the FWS found that plaintiff's 1988 and 1990 plans would jeopardize the continued existence of the endangered rabbit and rat, but that the implementation of RPAs would remove this jeopardy determination and allow development to proceed. Despite plaintiff's characterization of the ESA, the vast majority of development projects subject to jeopardy determinations do proceed in this way, allowing development to occur with modification.[34] The FWS also found that it was unlikely that implementation of the RPAs would result in the incidental take of individual rabbits, although as discussed above the agency was authorized to permit such a take. In sum, even if the development of Sugarloaf Shores consistent with the FWS RPAs would result in the take of individual rabbits on the property, the ESA does not legally require that the property be maintained in its natural state.[35]

**b.** **Estimating the Fair Market Value of Sugarloaf Shores**

■ Plaintiff argues in the alternative that even if the development of Sugarloaf Shores

---

**33.** Accordingly, plaintiff's argument that development would expose him to civil or criminal prosecution by the FWS under the ESA is without merit. Any incidental take could be permitted by the FWS, and accordingly would not be a violation of the Act. Plaintiff misreads the ESA citizen suit provision when he argues that, even if the FWS would not bring such a suit, that a "bunny lover fan club" could do so. This provision only allows citizens, including the environmental groups of apparent concern to plaintiff, to sue for injunctive relief. 16 U.S.C. § 1540(g). While plaintiff may be correct that the prospect of such a suit would "dampen the enthusiasm of any landowner whose property is habitat of an endangered species," enthusiasm is not an interest protected by the takings clause.

**34.** In its 1992 ESA review, the General Accounting Office found that from 1987 to 1992, nearly 90% of the small number of section 7 consulta-

tions that resulted in jeopardy findings prescribed reasonable and prudent alternatives that allowed development to proceed. United States General Accounting Office, *Endangered Species Act: Types and Number of Implementing Actions* (1992); *see generally* Oliver A. Houck, *The Endangered Species Act and its Implementation by the U.S. Departments of Interior and Commerce*, 64 U. Colo. L.Rev. 277 (1993).

**35.** The affidavits of a mortgage lender, commercial banker, real estate broker and developer submitted by plaintiff, each stating that the FWS finding that Sugarloaf Shores provided habitat for the endangered rabbit and rat left Sugarloaf Shores valueless, do not change this result. Defendant's depositions of each affiant revealed that none had any knowledge of the ESA exemptions or the role of RPAs, and that their common opinion was based upon misconceptions of the operation and requirements of the statute.

pursuant to the FWS RPAs would not violate the ESA, such development is not economically viable, and accordingly has the same effect as an outright denial. Defendant responds that plaintiff cannot establish that the federal restrictions have any effect on the value of Sugarloaf Shores because he cannot show a "reasonable probability" that such development would be permitted under state and county law in the absence of those federal restrictions. Evaluating the economic impact of a regulation in a takings claim requires a comparison of "the value that has been taken from the property with the value that remains in the property...." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987).

In order to conduct this evaluation here, several underlying issues must be resolved. First, the extent of development legally permissible under federal law must be known. The resolution of this issue here is complicated by a dispute concerning the proper characterization of the final decision in this case. Second, after the extent of development legally permissible under federal law is defined, the role of similar state and county restrictions in estimating the fair market value of Sugarloaf Shores must be determined. The resolution of both of these underlying issues reveals undisputed evidence that the federal restrictions do not deprive Sugarloaf Shores of all economic value. Accordingly, plaintiff's *Lucas per se* claim is rejected.

### i. Extent of Federal Restrictions

Identifying the extent of development legally permitted on Sugarloaf Shores is a necessary prerequisite to evaluating the economic impact of the federal restrictions in this case. The importance of this inquiry is reflected in the ripeness doctrine which holds that a takings claim will not be heard if no

such decision has been reached. *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985); *Heck v. United States,* 37 Fed. Cl. 245, 250 (1997), appeal docketed, No. 97–5067 (Fed.Cir. 1997).[36] While defendant has not squarely raised the ripeness issue, the rationale underlying the ripeness rule which requires developers to seek approval for a less intensive development scheme after an initial denial requires a consideration of both the 1991 and 1995 FWS development alternatives in this case.

■ Plaintiff argues that the Corps denial together with the initial FWS RPAs were the final decision in this case, and that the additional RPAs should not be considered here. He maintains that this is the proper characterization of the final decision because he could not secure an administrative appeal of that decision before bringing suit here.[37] While plaintiff is correct that he could not secure administrative review of the Corps denial, this does not bear upon whether the Corps denial finally defined the extent of development legally permitted on Sugarloaf Shores. Rather, plaintiff's observation bears on the question of whether he has exhausted administrative remedies. In *Williamson,* the Supreme Court explained the difference between these two doctrines:

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate....

---

**36.** *See generally* Gregory M. Stein, *Regulatory Takings and Ripeness in the Federal Courts,* 48 Vand. L.Rev. 1 (1995).

**37.** Plaintiff's argument that defendant has conceded that the denial was the final decision is not supported by the record. In a hearing before this court and in written submissions, plaintiff contends that the Corps denial letter characterizes that denial as "final agency action." The

denial letter does not contain this language. Plaintiff also erroneously asserts that defendant's answer and another Corps letter characterize the denial in this way. Hr'g Mot. to Stay Tr. at 64. Defendant has conceded only that the denial was final as to that particular application, and that development of Sugarloaf Shores under a different scheme was possible.

473 U.S. at 193, 105 S.Ct. at 3120. The question of whether plaintiff exhausted his administrative remedies would be an issue for consideration if plaintiff were challenging the validity of the Corps denial. In the instant suit, plaintiff concedes the validity of that action, *see supra* n. 32, and accordingly exhaustion is not an issue here.

The finality of the Corps decision, however, is an issue properly considered here. While in the ordinary case, Corps denials will indicate that the decision is "final," this language by itself does not mean that the Corps would not consider a different application. Ripeness doctrine requires a court to look past this language to determine whether the Corps denial has actually defined the scope of development permitted under federal law. *Compare Heck*, 37 Fed. Cl. at 251 (takings claim unripe where wetland permit denial addressed procedural rather than substantive defect in permit application), *with City Nat'l Bank v. United States*, 30 Fed. Cl. 715, 720 (1994) (takings claim ripe where wetland permit denial indicated that permit applicant had "no possibility" of obtaining federal permit under any condition). Neither the Clean Water Act nor Corps regulations limit plaintiff's ability to submit a new application reflecting a different, less intensive plan.

In *Williamson* and *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), the Supreme Court considered the finality issue in the land development context. Relying upon *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981) (takings challenge to federal mining law unripe where

plaintiff had not sought variance), the Court rejected takings claims brought by developers, after the first denial of a development plan, on ripeness grounds. In both cases, the Court required the developer to seek a variance from the denial or approval for a less intensive development plan before his takings claim could be heard.[38] Developers may be relieved of this requirement, however, if able to demonstrate that such an effort would be futile. *See MacDonald*, 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7; *Heck*, 37 Fed. Cl. at 252 (dismissing futility argument in wetland takings case noting that "a difficult position does not necessarily equal a futile position").

The Supreme Court recently reaffirmed the holdings of *Hodel, Williamson* and *MacDonald* in *Suitum v. Tahoe Regional Planning Agency*, — U.S. —, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). Discussing those cases, the Court explained that "[t]hose precedents addressed the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise." *Id.* at —, 117 S.Ct. at 1667. Like the regional land use authority involved in *Suitum*, both the Corps and the FWS exercise significant discretion under the CWA and the ESA. Further, both agencies have exercised this discretion to institute regulatory mechanisms that allow for the accommodation of development when consistent with statutory mandates.[39]

By requiring developers to make a good faith effort to satisfy permitting agency con-

---

**38.** In *Loveladies Harbor v. United States*, 15 Cl.Ct. 381 (1988), the court dismissed the applicability of *Williamson* because neither the CWA nor Corps regulations provide for a "variance" procedure similar to the one involved in that case. *Id.* at 386–87. While it is true that neither so provide, this does not render *Williamson* inapposite. The rationale underlying that decision, and reflected again in *MacDonald*, is that if the statutory regime permits for reapplication, such reapplication must be made. *See, e.g., Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 503 (9th Cir.1990) (use of word "variance" in *Williamson* not talismanic; if other types of actions would provide relief, they must be pursued).

**39.** *See, e.g.,* 33 C.F.R. pt. 320 (public interest balancing test for issuance of Corps wetlands permits); Final Notice of Issuance, Reissuance, and Modification of Nationwide Permits, 61 Fed. Reg. 65,874 (December 13, 1996) (exempting a half-acre or less of wetland loss for the construction of a single family home from CWA requirements); Endangered and Threatened Wildlife and Plants; Proposed Rule Exempting Certain Small Landowners and Low–Impact Activities From Endangered Species Act Requirements for Threatened Species, 60 Fed.Reg. 37,419 (July 20, 1995) (exempting 5 acres or less for residential housing from ESA threatened species requirements); John F. Turner, *The Endangered Species Act and Private Property: Conserving Endangered Species on Private Lands*, 32 Land & Water

cerns after an initial denial, ripeness doctrine reflects the reality that land development often involves a process of negotiation between the permitting agency and developer. As the Supreme Court recognized in *MacDonald*, "[l]and use planning is not an all-or-nothing proposition. A governmental entity is not required to permit a landowner to develop property to [the] full extent he might desire or be charged with an unconstitutional taking of the property...." *MacDonald*, 477 U.S. at 347, 106 S.Ct. at 2565.[40]

■ Plaintiff here chose to take just such an all-or-nothing approach when faced with his first ever federal permit denial.[41] Rather than cooperating with the FWS as it developed RPAs, plaintiff instead chose to challenge its authority to engage in that process under the ESA. Applying the rationale underlying the ripeness doctrine, it is decided that both the 1991 and 1995 RPAs will be considered here in the absence of plaintiff's own good faith effort to make one reapplication.[42]

### ii. The Effect of State and County Restrictions on the Fair Market Value of Sugarloaf Shores

■ Based upon the extent of development legally permissible under federal law, the fair market value of the property in the absence of the FWS restrictions and the fair market value of the property in the presence of those restrictions must be estimated. Defendant argues that plaintiff cannot establish that the federal restrictions have any effect on the value of Sugarloaf Shores because he cannot show a "reasonable probability" that such development would be permitted under state and county law. More particularly, defendant maintains that uses which are not reasonably probable to occur should be excluded from the fair market value calculation. While state and local development restrictions are relevant in a federal takings case and may be considered in arriving at fair market value, defendant's argument that those restrictions may be relied upon here to serve as a total defense to plaintiff's *Lucas per se* claim is rejected.

The "reasonable probability" proposition advanced by defendant has its origins in eminent domain actions, and is applied in those actions as a guide to measure just compensation. Just compensation is, in most cases, set according to the fair market value of the property taken by the government. "Fair market value" is defined as the:

> most probable price, as of a specified date, in cash, or in terms equivalent to cash, or

L.Rev. 571 (1997) (describing FWS landowner-friendly ESA initiatives).

**40.** Many courts have applied the *MacDonald* rule. *See, e.g., Southview Associates, Ltd. v. Bongartz*, 980 F.2d 84, 98 (2d Cir.1992) (takings claim unripe where denial of land use application did not preclude submission of modified application); *Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1541 (11th Cir.1991) (takings claim unripe where developer failed to pursue less intensive development scheme), *cert. denied*, 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); *Villas of Lake Jackson, Ltd. v. Leon County*, 796 F.Supp. 1477, 1480 (N.D.Fla.1992) (denial of multifamily development did not present ripe takings claim where no application made for single family development permitted by zoning statute); *Killington, Ltd. v. Vermont*, 164 Vt. 253, 668 A.2d 1278, 1283 (1995) (takings claim unripe where permit denial contained mitigation measures that would satisfy endangered species concerns and allow for development); *Martin County v. Section 28 Partnership, Ltd.*, 676 So.2d 532, 537 (D.C.A. 4th Fla.1996) (alternative uses must be applied for and conclusively denied by regulatory body), *cert. denied*, —— U.S. ——, 117 S.Ct. 1553, 137 L.Ed.2d 701; *Tinnerman v. Palm*

*Beach County*, 641 So.2d 523, 525 (D.C.A. 4th Fla.1994) (futility not established until developer has submitted one meaningful application for modification, variance, or less intensive use).

**41.** Plaintiff's 1990 modification was undertaken in order to meet state and county concerns, rather than federal concerns. Plaintiff was routinely granted federal permits for his plans up until the 1990 Corps application.

**42.** In *Lucas*, the defendant argued that the plaintiff's takings claim was not ripe because he had not availed himself of a variance procedure instituted after the filing of his claim. 505 U.S. at 1011, 112 S.Ct. at 2890–91. The Supreme Court rejected the ripeness challenge, in part, on the prudential ground that it would "not accord with sound process" to require the plaintiff to avail himself a variance procedure that was not available to him prior to filing suit. *Id.* The same "sound process" considerations raised in *Lucas* are not implicated where, as here, the opportunity to pursue a variance or less-intensive development scheme was available before suit was filed.

in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 19 (9th ed. 1987). Fair market value is usually determined by reference to "highest and best use" of the property, which may be either the current use of the property at the time of the taking, or a use other than the existing use if the property is clearly adaptable to that use.

The Supreme Court established the standard to guide whether uses of property other than current uses should be considered in arriving at fair market value in *Olson v. United States*, 292 U.S. 246, 256, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934). In *Olson*, the condemnee sought to have the fair market value of his property reflect its use as a reservoir. The Court rejected this argument, however, finding that the condemnee failed to show that there was a "reasonable possibility" that the necessary lands and easements could be acquired to effect that use where those lands were held by over a thousand different landowners, a foreign country and the United States. *Id.* at 255, 54 S.Ct. at 708–09. In so ruling, the Court explained:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value....

*Id.* at 257, 54 S.Ct. at 709; *see also Board of County Supervisors v. United States*, 116 F.3d 454, 457 (Fed.Cir.1997) (valuation in eminent domain).

The *Olson* rule has been applied by analogy to regulatory takings claims to evaluate the economic impact of regulation, and it has raised at least two difficulties in the translation. First, the rule has been relied upon to reject the consideration of viable markets that do not involve a present use of land. Second, the rule has been relied upon to deprive a federal regulatory takings plaintiff any recovery where the use prohibited by the federal government would not have been permitted under a similar, though independent, state or local regulatory regime.[43] Both of these difficulties counsel against the application of the *Olson* rule as urged by defendant.

The first difficulty is illustrated by the ongoing valuation dispute in the *Florida Rock* litigation. In *Florida Rock*, the Corps denied the plaintiff a federal permit to mine a large wetland west of suburban Miami. The plaintiff had the requisite state and local permits to engage in that use. Focusing solely upon whether there was an immediate economic use for the property, the court excluded evidence establishing value based upon a market of investors speculating that the federal prohibition would one day yield to development pressure from nearby Miami. Relying upon *Olson*, the court found that "[i]t is well established that speculative value may not be taken into account for purposes of determining compensation in condemnation proceedings.... It seems eminently sensible, as well as entirely fair, to apply the same rule in inverse condemnation cases." *Florida Rock Indus. v. United States*, 8 Cl. Ct. 160, 167–68 (1985) (*Florida Rock I* ).

The Federal Circuit disagreed, finding that the court had misapplied the rule, and remanded the case. *Florida Rock*, 791 F.2d at 903 (*Florida Rock II* ). The Federal Circuit explained:

> This rule ... means that the court must not, itself, speculate, i.e., guess, about potential end uses or markets when the speculation is so remote or improbable that one would not invest his money in it. It does

---

**43.** Plaintiff does not argue here that the state and county restrictions were mandated by the federal regulatory regime. Where the state has effected the alleged taking action under order of the federal government, liability will rest, if at all, with the federal government. *See Hendler v.*

*United States*, 952 F.2d at 1379 (takings liability for the state installation of groundwater monitoring wells would properly rest with the federal government where the state acted under federal order).

not exclude consideration of a relevant market made up of investors who are real but are speculating in whole or major part. *Id.* After the court again rejected evidence of this market, *Florida Rock Indus. v. United States,* 21 Cl.Ct. 161, 172–73 (1990) (*Florida Rock III* ), the Federal Circuit again remanded on this issue, strongly advising that "[a] speculative market may exist in land that is regulated as well as in land that is not, and the precise content of regulations at any given time may not be particularly important to those active in the market." *Florida Rock Indus. v. United States,* 18 F.3d 1560, 1566 (Fed.Cir.1994) (*Florida Rock IV* ).

Adopting the proposition urged by defendant here that fair market value may not include uses impermissible under the state or county regulatory regime would exclude from consideration the possible existence of a market of investors speculating on a future development use for Sugarloaf Shores. The possibility that such a market could exist is evidenced by plaintiff's own representations relating to Sugarloaf Shores. In his 1980 contract with Keycology, for example, after acknowledging the dim prospects for obtaining the necessary permits to develop Sugarloaf Shores, plaintiff nonetheless speculated that the property had a worth of $350,000.00 in its undeveloped state without those permits. Def. Summ. J. Ex. 33.

Even were *Olson* carefully applied to ensure that the calculation of fair market value were not improperly restricted to present uses of property, however, it should still be rejected where it is relied upon as a total defense to a *Lucas* claim. This second difficulty with applying the *Olson* rule as urged by defendant was considered in *City National Bank v. United States,* 33 Fed. Cl. 759 (1995).

In *City National Bank,* the plaintiff sought to exclude evidence of a county land use law in determining the economic impact of a Corps action where the county law proscribed the same mining activity prohibited by the Corps. That evidence would only be excluded, it was ruled, if the plaintiff could demonstrate a "reasonable probability" that he could obtain the necessary county approvals to mine his property. *Id.* at 761. The

plaintiff conceded he could not so demonstrate, and his takings claim was dismissed on the ground that the Corps denial had no effect on the value of his property. *Id.* at 763.

The theory behind applying the *Olson* rule as above may be based, in part, upon the premise that it would be illogical to allow a takings plaintiff to establish liability based upon uses that would not later be considered in setting just compensation. This rationale, however, assumes that a court is bound to apply this rule in determining just compensation. The Supreme Court has held, however, that there is no set formula for arriving at the measure of just compensation:

> The Court in its construction of the constitutional provision has been careful not to reduce the concept of 'just compensation' to a formula. The political ethics reflected in the Fifth Amendment reject confiscation as a measure of justice. But the Amendment does not contain any definite standards of fairness by which the measure of 'just compensation' is to be determined. The Court in an endeavor to find working rules that will do substantial justice has adopted practical standards, including that of market value. But it has refused to make a fetish even of market value, since that may not be the best measure of value in some cases.

*United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949) (internal citations omitted).

To apply the *Olson* rule as a total defense to a *Lucas per se* claim would run contrary to the spirit of the Fifth Amendment. As this court has noted, "[a]ssuming that no economically viable use remains for the property, the Constitution could not countenance a circumstance in which there was no fifth amendment remedy merely because two government entities acting jointly or severally caused a taking." *Ciampetti v. United States,* 18 Cl.Ct. 548, 556 (1989). Accordingly, it is concluded that state and county restrictions at issue in this case may not validly be asserted to effect a total defense to a *Lucas per se* claim.

Importantly, however, this conclusion should not be construed to mean that state and local development restrictions have no bearing on the issue of federal takings liability. Those restrictions bear on liability in at least two ways. First, where state and local limitations are grounded in state nuisance or property law, those limitations must be considered in the *Lucas* antecedent inquiry into the nature of the owner's title. Second, state and local restrictions must be considered in determining the presence or absence of reasonable investment-backed expectations to engage in the proscribed use.

### iii. Economically Viable Uses Under Federal Law

While the state and county restrictions at issue in this case will not be considered a total defense to federal takings liability, the question of whether Sugarloaf Shores retains economic value in light of the FWS restrictions remains. Since the burden of demonstrating no remaining economic value would rest with plaintiff at trial, defendant may meet its initial burden on this issue by demonstrating that there is an absence of evidence necessary to make this showing. If defendant meets that burden, the plaintiff must present facts evidencing a reasonable dispute exists on this issue. In support of its motion, defendant has submitted a professional appraisal report which demonstrates that Sugarloaf Shores retains economic value for development, or for the sale of transferable development rights under county law. Plaintiff has failed to present facts evidencing a reasonable dispute over either proposition.

The most reliable method of arriving at the fair market value of property, particularly unimproved property, is through the "sales comparison approach." That approach requires an appraiser to estimate fair market value based upon similar transactions in similar properties in the vicinity reasonably near the time of the alleged taking. Here, however, defendant's appraiser was unable to identify comparable sales of vacant, unimproved property. Due to this limitation, defendant's appraiser relied upon the "subdivision development method" in order to arrive at a fair

market value for Sugarloaf Shores. Under this approach:

> All direct and indirect costs [of development] and entrepreneurial profit are deducted from an estimate of the anticipated gross sales price of the finished lots; the resultant net sales proceeds are then discounted to present value at a market-derived rate over the development absorption period to indicate the raw value of land.

The Appraisal Institute, *Dictionary of Real Estate Appraisal* 354 (3d ed.1993). This approach toward valuation is generally disfavored on the ground that it is "highly speculative, prone to error, and reflects not so much the value as the highest price a developer can afford to pay for the land and still earn the desired profit." *Uniform Appraisal Standards for Federal Land Acquisition* A–8 (1992). Nonetheless it may be relied upon where no comparables of vacant unimproved land have been identified.

Unable to locate such comparables, defendant's licensed real estate appraiser, Theodore Slack, used the subdivision approach to estimate the fair market value of Sugarloaf Shores under two different assumptions. First, Mr. Slack estimated the fair market value of Sugarloaf Shores if the necessary county, state and federal permits could be obtained to develop the property according to the plan reflected in plaintiff's 1990 Corps application. Based upon these assumptions, Mr. Slack estimated gross sales revenues at $3,200,000.00, and total sales expense, holding costs and profit at $1,549,135.00. Considering these projections, Mr. Slack found that an investment of $1,200,000.00 in Sugarloaf Shores would be feasible assuming a profit margin of 15% and a 14% yield on investment, and concluded that such yields would attract an investor under current market conditions.

Mr. Slack next estimated the fair market value of Sugarloaf Shores if the necessary state and county permits could be obtained to develop the property in accordance with all FWS development alternatives. Employing the same approach, Mr. Slack estimated gross sales revenues at $1,503,474.00, and total sales expense, holding costs and profit at $1,063,671.00. Considering these projec-

tions, Mr. Slack found that an investment of $80,000.00 in Sugarloaf shores would be feasible based upon the same assumptions above. Finally, Mr. Slack estimated the fair market value of Sugarloaf Shores under the county's transferable development rights program. Finding an active market for the sale of these rights, Mr. Slack found Sugarloaf Shores would have a fair market value of $110,000.00.[44]

▮ Plaintiff responded to defendant's proffer not with an appraisal report, but with the affidavit of a licensed real estate appraiser. In that five page affidavit, plaintiff's appraiser, Trent Marr, estimates the fair market value of Sugarloaf Shores under two different assumptions. First, Mr. Marr found that if the necessary permits could be obtained to effect the 1990 plan, Sugarloaf Shores would have a fair market value of $1,540,000.00. Second, Mr. Marr found that development of Sugarloaf Shores limited to the 1991 FWS RPAs would not be economically viable. Mr. Marr concluded that "based upon the determination by the U.S. Fish and Wildlife Service and the Corps of Engineers, that the property is a habitat for federally listed endangered species, has totally destroyed the property's marketability and therefore its fair market value." As a result, Mr. Marr placed the fair market value of Sugarloaf Shores after the Corps denial at between $23,000.00 and $40,000.00 for sale to an environmental or conservation group.

Absent from Mr. Marr's affidavit is an analysis of the economic value of development pursuant to the complete list of FWS RPAs. Mr. Marr also fails to consider the economic value of transferable development rights. Plaintiff has offered no other proffer on these issues. Accordingly, plaintiff has failed to present facts evidencing the existence of reasonable dispute concerning the economic value of these uses for Sugarloaf Shores. Instead, plaintiff has raised a legal challenge to the consideration of transferable development rights in this case.[45]

#### iv. Transferable Development Rights Under County Law

Defendant's appraiser determined that Sugarloaf Shores retains economic value, notwithstanding the Corps action, for the sale of transferable development rights ("TDRs"). TDR programs aim to direct development away from environmentally sensitive land to land more suitable for development by creating a market for development rights. Logistically, TDR programs achieve this result by quantifying the development potential of sensitive properties ("sending sites"), and providing that this development potential may be sold to landowners to increase building density in areas suitable for development ("receiving sites").[46] Under the county's TDR program, see MCC § 95–265 (1986), Mr. Slack concluded that the TDR rights available for Sugarloaf Shores have a fair market value of $110,000.00. Plaintiff has not disputed these findings.[47]

44. Notwithstanding these findings, plaintiff erroneously claims that defendant has conceded that development according to the FWS RPAs is not economically viable. Plf. Mot. to Supp. at 2. In particular, plaintiff interprets defendant's statement that the economic viability of the FWS RPAs was mooted by Mr. Slack's finding that the RPAs do not represent the "highest and best use" of Sugarloaf Shores, Def. Reply at 11, as a concession that those RPAs are not economically viable. Contrary to this creative interpretation, it is clear that defendant's position is simply that at $110,000.00, transferable development rights represent a more valuable use of Sugarloaf Shores than development consistent with the FWS RPAs. Defendant nowhere concedes that development in accordance with the RPAs is not economically viable.

45. As noted earlier, plaintiff also raised a legal challenge to the consideration of the 1995 FWS

RPAs. See supra at II.b.i. Even if plaintiff's challenge had proven successful, thereby barring a consideration of the $80,000.00 value ascribed to development pursuant to the total set of RPAs, plaintiff has nonetheless failed to raise a factual dispute concerning the value of transferable development rights available for Sugarloaf Shores.

46. See generally James T.B. Tripp and Daniel J. Dudek, Institutional Guidelines for Designing Successful Transferable Rights Programs, 6 Yale J. On Reg. 369 (1989); Brief of the State of New Jersey as Amicus Curiae in Support of Respondent in Suitum v. Tahoe Regional Planning Agency, 1997 WL 9054 (describing the active TDR market in the New Jersey Pinelands).

47. Mr. Slack notes in his appraisal that in order to be marketed for TDRs, the downzoning of Sugarloaf Shores would be required. In conducting his appraisal, Mr. Slack consulted with

Instead, plaintiff mounts a legal challenge to the consideration of TDRs, arguing that it is inappropriate to consider TDRs in determining takings liability. In *Penn Central*, however, the Supreme Court took the contrary view:

> While these rights [TDRs] may well not have constituted 'just compensation' if a 'taking' had occurred, the rights nevertheless undoubtedly mitigate whatever financial burden the law has imposed on appellants and, for that reason, are to be taken into account in considering the impact of regulation.

*Penn Central,* 438 U.S. at 137, 98 S.Ct. at 2666; *see also Deltona Corp. v. United States,* 657 F.2d 1184, 1192 n. 14, 228 Ct.Cl. 476, 490 n. 14 (1981) (TDRs considered in evaluating the economic impact of the regulation), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *Gardner v. New Jersey Pinelands Comm'n,* 125 N.J. 193, 593 A.2d 251, 261 (1991) (upholding development restrictions against takings challenge based, in part, on availability of TDRs); *J.T. Glisson v. Alachua County,* 558 So.2d 1030, 1036 (D.C.A. 1 Fla.1990) (rejection of takings challenge based, in part, on value of TDRs), *rev. denied,* 570 So.2d 1304 (Fla.1990).

While plaintiff acknowledges this precedent, he argues that the Supreme Court's recent decision in *Suitum v. Tahoe Regional Planning Agency* casts doubt upon its efficacy. Contrary to plaintiff's characterization, the Supreme Court in *Suitum* reaffirmed the relevance of TDRs to determining takings liability.

In *Suitum,* the regional land use scheme proscribed the development of plaintiff's property, but provided the plaintiff with valuable TDRs which she could sell to landowners in areas where development was permissible. Although the exact number of TDRs to which the plaintiff was entitled were known and could be properly appraised, the Ninth Circuit found her takings claim unripe because she had not actually attempted to sell those rights. *Suitum v. Tahoe Regional Planning Agency,* 80 F.3d 359, 362–63 (9th Cir.1996). The Supreme Court reversed, finding the takings claim ripe. *Suitum,* ⸺ U.S. at ⸺, 117 S.Ct. at 1668. Three justices concurred in this judgment, but dissented to the portion of the majority opinion that analyzed the question of whether the plaintiff should have to sell her TDRs in order to present a ripe claim. Those justices objected to this analysis on the ground that it necessarily required the Court to accept as valid the premise that TDRs are relevant to the question of determining takings liability. *Id.* at ⸺, 117 S.Ct. at 1670.

While the concurring justices in *Suitum* clearly indicate opposition to this proposition, their opinion underscores the Court's reaffirmance of the *Penn Central* holding that the value of TDRs is to be considered to answer the threshold question of whether a taking has occurred. Accordingly, plaintiff's legal challenge to the consideration of TDRs in this case is rejected.

### III. Penn Central *Factors*

Plaintiff argues that even if his claim does not fall within the *Lucas per se* rule, he had reasonable investment-backed expectations to develop Sugarloaf Shores, and therefore can demonstrate a taking under *Penn Central.*[48] In particular, plaintiff argues that he

---

county officials to determine whether such downzoning was a realistic assumption. County officials represented that this assumption was realistic since such downzoning would more accurately reflect Sugarloaf Shores' unimproved state relative to its current "improved subdivision" zoning classification. While plaintiff points out that the property is not presently zoned for TDR use, he does not dispute defendant's contention that it is realistic to assume that the necessary downzoning would be granted.

**48.** As noted earlier, in *Penn Central* the Supreme Court identified three factors to consider in analyzing a regulatory takings claim: the character of the government action, the economic impact of the regulation, and the extent to which the regulation interferes with reasonable investment-backed expectations. While it is determined that plaintiff's takings claim fails under the expectations factor, *see Monsanto,* 467 U.S. at 1013, 104 S.Ct. at 2878, it should be noted that the other two *Penn Central* factors have been considered by the court.

First, there was no infirmity in the character of the government action in this case. No physical occupation occurred here, and plaintiff concedes that the Corps action advances a legitimate government interest. Plf. Compl. at 21. Second, while the Corps action has had a significant

succeeds in this *Penn Central* claim because at the time he purchased Sugarloaf Shores, the ESA had not yet been enacted, and the Corps had not yet asserted jurisdiction over wetlands under the CWA. In the alternative, plaintiff argues that the Federal Circuit's recent decision in *Preseault* establishes that expectations are no longer relevant to the takings inquiry.

Both contentions are in error. First, federal law restricting the use of Sugarloaf Shores did predate plaintiff's initial purchase investment. Further, by the time plaintiff chose to invest in development, the specific restrictions at issue in this case were in place. Second, the Federal Circuit in *Preseault* explicitly cautioned that its expectations analysis is limited to physical occupation takings claims, and is not properly applied to a takings claim which, as here, involves a restriction on land use. 100 F.3d at 1540.

### a. Reasonable Investment–Backed Expectations

The reasonable investment-backed expectations factor of the *Penn Central* test properly limits recovery to property owners who can demonstrate that their investment was made in reliance upon the non-existence of the challenged regulatory regime. In part, the rationale for this rule is that one who invests in property with the knowledge of a restraint assumes the risk of economic loss. *Loveladies Harbor v. United States,* 28 F.3d 1171, 1177 (Fed.Cir.1994); *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir.1994). This inquiry is informed not only by whether the specific regulatory restrictions at issue were in place at the time of purchase, but also by the regulatory climate at that time, and whether plaintiff's investment in purchase and development can be considered objectively reasonable in light of that climate.

The Court of Claims first considered the role of expectations in its 1981 decision in

*Deltona.* In that case, the court rejected a takings claim brought by a Florida developer prohibited from completing a multi-phase development project after the broadening of the Rivers and Harbors Act ("RHA"), the passage of the CWA, and the Corps assertion of jurisdiction over wetlands pursuant to the CWA. Commenting upon some of the same regulatory restrictions at issue in this case, the court recognized that "[t]he implementing regulations adopted by the Corps of Engineers pursuant to its statutory authority have grown increasingly complex and rigorous since the late 1960's." 657 F.2d at 1187. Finding this strengthening of the regulatory regime to be the "key legal event" in the case, *id.,* the court held that Deltona's expectations in development were only reasonable until the law began to change. The court found no taking. *Id.* at 1190.

The impact of a pervasive regulatory regime on expectations was first squarely addressed by the Supreme Court in *Monsanto.* In that case, Monsanto argued that amendments to federal law which newly provided for the disclosure of trade secrets submitted to the government in pesticide registration resulted in a taking. The statute in effect at the time Monsanto submitted the information was silent on the issue of disclosure. 467 U.S. at 1008, 104 S.Ct. at 2875–76. Recounting the long history of government regulation of the pesticide industry, the Court declined to narrowly limit the expectations inquiry to a consideration of the law in effect at the time of submission. *Id.* at 1013, 104 S.Ct. at 2878. Rather, relying upon the pervasiveness of this federal regulation, the Court found that Monsanto could not have a reasonable expectation that the federal government would not later require disclosure. The Court found no taking on the basis of expectations alone. *Id.*

A year later the Supreme Court affirmed the rule that property owners operating in a highly regulated field could not have a rea-

---

economic impact, the uncontested findings of defendant's appraiser established a fair market value for Sugarloaf Shores, either for development or for the sale of transferable development rights, that approximates plaintiff's initial investment in Sugarloaf Shores. In evaluating the economic impact of a regulation outside of the

*Lucas* context, the Federal Circuit has provided that "[i]n determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Florida Rock II,* 791 F.2d at 905.

sonable expectation that government regulation would not be altered to their detriment in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986). In that case, the plaintiff argued that the amendment of federal pension law to require a greater financial contribution from employers than originally anticipated gave rise to a taking. Rejecting this claim, the Court found that "[t]hose who do business in a regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.* (quoting *FHA v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)); *see also Concrete Pipe,* 508 U.S. at 645–46, 113 S.Ct. at 2291–92 (pension regulation).

This rule has been properly applied to takings claims involving real property where land development arises in a business context which, as in *Deltona,* is not different in kind from the highly regulated business enterprises at issue in *Monsanto, Connolly* and *Concrete Pipe.* In *Corn v. City of Lauderdale Lakes,* for example, a developer sought to put property to an industrial use permitted at time of purchase, but prohibited when he sought approval for that use a decade after purchase. Rejecting his takings claim, the 11th Circuit found that the prohibition did not upset reasonable investment-backed expectations due to the pervasiveness of land use regulation, the length of time after purchase that the developer waited to secure development approval, and the fact that development was not backed by any investment other than the original purchase. 95 F.3d at 1070; *see also Ciampetti v. United States,* 22 Cl.Ct. 310, 320 (1991); *McNulty v. Town of Indialantic,* 727 F.Supp. 604, 610 (M.D.Fla. 1989).

### i. Regulatory Regime at Time of Initial Investment

■ When plaintiff purchased Sugarloaf Shores in October 1973, land development in ecologically sensitive areas was already subject to pervasive federal and state regula-

tion. Contrary to plaintiff's contention, that legal regime had been relied upon to restrict the development uses plaintiff sought for Sugarloaf Shores. Plaintiff explicitly recognized this regime in his April 1973 purchase contract for Sugarloaf Shores wherein he acknowledged that "as of today there are certain problems in connection with the obtaining of State and Federal permission for dredging and filling operations." [49] Plf. Summ. J. Ex. at 7.

Those dredging and filling operations had, in fact, been subject to federal regulation since the 1899 enactment of the RHA and its prohibition on such activities except by permit. 33 U.S.C. § 403. By the late 1960s, the Corps RHA permit review included the consideration not only of navigation, but also of fish and wildlife, conservation, pollution, aesthetics, ecology and the general public interest. 33 C.F.R. § 209.120(d) (1968).

Prior to plaintiff's purchase of Sugarloaf Shores, the Corps was implementing this broad review standard to deny RHA permits for activities proposed by plaintiff, including the filling of tidal wetlands and the connection of canals landward of the MHWM to navigable waters. *Zabel v. Tabb,* 430 F.2d 199 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971), for example, involved a developer's challenge to the Corps 1967 denial of a RHA permit to fill tidal wetlands in Boca Ciega Bay, Florida, based upon ecological concerns. *Id.* at 202. The Fifth Circuit upheld the Corps denial. Similarly, *United States v. Sexton Cove Estates,* 526 F.2d 1293, 1298 (5th Cir.1976) and *Weiszmann v. U.S. Army Corps of Engineers,* 526 F.2d 1302, 1303–05 (5th Cir.1976), involved developer challenges to 1971 and 1973 Corps orders that RHA permits be obtained for the dredging of canals landward of the MHWM. The *Weiszmann* case involved property on Sugarloaf Key. Again, the Fifth Circuit upheld the Corps action.

The enactment of the CWA in 1972 broadened the federal government's reach over the nation's waters, making it unlawful to discharge pollutants into those waters except by

---

49. Lacking this explicit acknowledgment, plaintiff would nonetheless be constructively charged with knowledge of these restrictions. *See Federal*

*Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947).

permit. 33 U.S.C. § 1311(a). The Act placed the authority to regulate discharges of dredged or fill material in the Corps, 33 U.S.C. § 1344(a), and provided the Environmental Protection Agency ("EPA") with veto authority over Corps permitting decisions. 33 U.S.C. § 1344(c). Shortly after the passage of the 1972 Act, the EPA adopted its first wetlands policy of implementing its programs and authorities to protect wetlands from dredging and filling practices. Protection of Nation's Wetlands, 38 Fed.Reg. 10,834 (May 2, 1973) (recognizing that "[w]etlands represent an ecosystem of unique and major importance to the citizens of this Nation and, as a result, they require extraordinary protection").

Prior to plaintiff's purchase of Sugarloaf Shores, federal law also required the Corps to consider the fish and wildlife impacts of its permitting decisions. The Fish and Wildlife Coordination Act ("FWCA") requirement that federal agencies proposing to alter any body of water to first consult with the FWS concerning the fish and wildlife impacts of the action, 16 U.S.C. § 662(a), was first enacted in 1946. Act of August 14, 1946, ch. 965. RHA permit review by the Corps triggered this consultation requirement. *See Zabel,* 430 F.2d at 209 (FWCA consultation on RHA permit). FWS conservation recommendations issued under FWCA were to be considered by the Corps, which was then required to make "adequate provision" for the conservation of wildlife. Act of August 14, 1946, ch. 965, § 3. The first federal endangered species legislation followed FWCA in 1966. The Endangered Species Preservation Act, Pub.L. No. 89–699, §§ 1–3, 80 Stat. 926 (repealed 1973), gave the Secretary of the Interior the authority to list species "threatened with extinction," and to acquire land to protect such species.

Florida also regulated dredge and fill activities prior to plaintiff's purchase of Sugarloaf Shores. The Bulkhead Act of 1957, 1957

Fla.Laws 306, for example, instructed local authorities to establish bulkhead lines beyond which no filling activities could occur. Politicization of the bulkhead setting process led to the enactment of the Beach and Shore Preservation Act of 1965, 1965 Fla.Laws 1435, which removed the discretion of local authorities to set bulkhead lines, and required that permits be obtained to conduct activities below the MHWM. The Air and Water Pollution Control Act of 1967, 67 Fla. Laws 436, followed, and gave the Florida Department of Pollution Control the authority to regulate dredge and fill activities landward of the MHWM. To these authorities, the Water Resources Act of 1972, 1972 Fla. Laws 1082, added the statutory charge of minimizing the degradation of water resources generally, and preserving fish and wildlife.[50]

By 1972, Florida had also enacted a comprehensive land use planning scheme. The State Comprehensive Planning Act, Fla.Stat. §§ 186.001–.911 (Supp.1984), directed the state to prepare a comprehensive land use plan, and the Environmental Land and Water Management Act, Fla. Stat. §§ 380.012–.12 (1983 & Supp.1984), created a statutory regime for regulating development in Areas of Critical State Concern. The Florida Supreme Court described this breadth of this latter statute:

> The Act affects regulation of virtually all development in an area of critical state concern: all building, mining, and changes in the use or appearance of land, water and air and appurtenant structures; material increases in the density of its use; alteration of shores and banks; drilling, structural demolition; clearing adjunct to construction; and deposit of waste or fill.

*Askew v. Cross Key Waterways,* 372 So.2d 913, 916 (Fla.1978). The Florida Keys were designated an Area of Critical State Concern in 1977.[51]

---

**50.** *See generally* Frank E. Malloney, Sheldon J. Plager, Richard C. Ausness & Bram D.E. Canter, *Florida Water Law* (1980).

**51.** In *Cross Key,* the Florida Supreme Court found the statutory procedure for designating Areas of Critical State Concern unconstitutional on the theory that the procedure constituted an

impermissible delegation of legislative power. 372 So.2d at 918. The Florida Legislature later corrected this infirmity by formally designating the Keys an Area of Critical State Concern. Florida Keys Protection Act of 1979, Fla. Stat. § 380.0552 (1979).

Together these statutes mandated the consideration of the wildlife impacts of federal permitting activities, the protection of wetlands and the regulation of navigable waters. In the purchase contract for the property, plaintiff explicitly recognized that his sought uses were subject to restriction under this regulatory regime. As the Federal Circuit noted in *Loveladies*, where a landowner such as plaintiff purchases property with knowledge of the regulatory restraint, no taking will be found, in part, because "it could be said that the market had already discounted for the restraint, so that a purchaser could not show a loss in his investment attributable to it." *Loveladies Harbor*, 28 F.3d at 1177. The pervasiveness of the regulatory regime at the time plaintiff purchased Sugarloaf Shores deprives him of a reasonable expectation to effect his development plans under the holdings of *Monsanto* and *Deltona*.

### ii. Regulatory Regime at Time of Investment in Development

██ Even if the December 1973 enactment of the ESA provided the relevant reference point for determining whether plaintiff had reasonable investment-backed expectations, his expectations claim would still fail. Plaintiff's investment in Sugarloaf Shores included not only his purchase of the property, but his subsequent investment in development.

Based upon defendant's appraisal in this case arriving at a fair market value of $110,-000.00, plaintiff could have roughly recouped his initial investment in Sugarloaf Shores but for the expenditures he made in attempting to prepare the property for development. As noted earlier, plaintiff's first major investment in that development occurred in October 1980 when he hired Keycology to attempt to obtain federal, state and county development permits. In his agreement with Keycology, plaintiff acknowledged that "obtain-

ing said permits is at best difficult and by no means assured...." Def. Summ. J. Ex. 33.

Indeed, by 1980 the regulatory regime that was in place at the time of plaintiff's initial purchase had been further strengthened. By 1974, the Corps had used its CWA authority to enjoin the filling of tidal wetlands. *See United States v. Holland*, 373 F.Supp. 665, 673 (M.D.Fla.1974). The Corps issued interim final regulations in the next year to explicitly provide that waters of the United States included wetlands. *See Natural Resources Defense Council v. Callaway*, 392 F.Supp. 685 (D.D.C.1975).[52] Further, by 1975 the Florida Department of Pollution Control had also adopted rules to regulate dredge and fill activities above the MHWM. Fla. Admin. Code Ann. r. § 17-4.28(2) (1975).

Finally, as enacted in December of 1973, the Endangered Species Act contained the major elements that are still central to the statute today. The Act provided for the listing of threatened and endangered species, prohibited the take of those species, and required federal agencies to consult with the FWS to insure that agency actions would not jeopardize the continued existence of such species. Pub.L. No. 93-205, 87 Stat. 884 (1973). Florida enacted its own similar endangered species legislation in 1977. Florida Endangered and Threatened Species Act of 1977, Fla. Stat. § 372.072.

By the time plaintiff began to invest in the development of Sugarloaf Shores, the regulatory regime in existence at purchase had been strengthened in order to achieve the purposes reflected in the earlier enactments. *See Connolly*, 475 U.S. at 227, 106 S.Ct. at 1027. In a case where a developer could recoup his initial investment in the property, but nonetheless chooses to continue to invest in development in the face of significant regulatory limitations, no reasonable expecta-

---

**52.** The Corps had initially interpreted the reference in the CWA to "waters of the United States" as limited by traditional concepts of navigability. This initial interpretation was first held invalid in *United States v. Ashland Oil and Transportation Co.*, 364 F.Supp. 349, 351 (W.D.Ky.1973) (CWA applies to non-navigable stream), *aff'd*, 504 F.2d 1317 (6th Cir.1974). In the next year, the Corps changed its interpretation to reflect the congres-

sional intent to assert jurisdiction over the nation's waters to the maximum extent permissible. *Callaway*, 392 F.Supp. at 686; *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 125, 106 S.Ct. 455, 458, 88 L.Ed.2d 419 (1985) (recounting the legislative history of the 1972 CWA and affirming the Corps assertion of jurisdiction over wetlands).

tions are upset when development is restricted or proscribed.

### b. The Role of Expectations in Physical Occupation as Distinguished from a Land Use Restriction Taking Case

Following the Federal Circuit's 1996 decision in *Preseault*, plaintiff filed a supplemental brief, newly arguing that a consideration of expectations in this case was no longer appropriate in light of that ruling. Although plaintiff quotes extensively from *Preseault* to support his argument, he stops just short of including the one passage particularly relevant to this case. In that passage, the Federal Circuit distinguishes the expectations inquiry in a permanent physical occupation takings case from that inquiry in a case which, as here, involves a restriction on land use. This distinction defeats plaintiff's argument.

As noted earlier, the Supreme Court first explicitly distinguished takings claims involving the permanent physical invasion of property from takings claims involving restrictions on the use of property in *Loretto*. In that case, the Court found that where the government regulation authorizes such an invasion, a taking would be found without reference to the other *Penn Central* factors, including reasonable investment-backed expectations. *Loretto*, 458 U.S. at 441, 102 S.Ct. at 3179. The rationale underlying this *per se* taking rule, the Court explained, is that "an owner suffers a special kind of injury when a stranger directly invades and occupies the owner's property ... property law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property." *Id.* at 436, 102 S.Ct. at 3176. Accordingly, where a permanent physical occupation can be shown, it is effectively presumed that the occupation upsets expectations.

Notwithstanding *Loretto*, in *Preseault* the government argued that expectations should

be considered in a physical occupation case. 100 F.3d at 1539. At issue in that case was whether the conversion of a railroad right-of-way to a public recreational trail pursuant to federal law gave rise to the taking of the underlying fee simple estate. In finding a taking, the Federal Circuit rejected the government's argument that the regulatory regime in existence preceding the landowners acquisition of the property, which included federal jurisdiction over the railroad rights-of-way, left the owners without a reasonable expectation that the government would not prevent reversion. The regulatory climate was not relevant, according to the Federal Circuit, because "permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation." *Id.* at 1540 (quoting *Loretto*, 458 U.S. at 441, 102 S.Ct. at 3179).

In the passage ignored by plaintiff in his brief to this court, the Federal Circuit was careful to distinguish the role of expectations in a physical occupation case from the role of expectations in a case involving a restriction on land use. The Federal Circuit explained: "[t]his issue of title and ownership expectations must be distinguished from the question that arises when the Government restrains an owner's use of property, through zoning or other land use controls, without disturbing an owner's possession." *Preseault*, 100 F.3d at 1540. In the latter case where, as here, a restriction on use is implicated "expectations have been held to be relevant to the question of whether a regulatory imposition goes too far in constraining the owner's lawful uses of the property." *Id.*

*Preseault* simply follows *Loretto's per se* rule that the other *Penn Central* factors, including reasonable investment-backed expectations, are not relevant where an owner's possession of property is disturbed through a permanent physical occupation.[53] Plaintiff does not maintain, nor could he on the facts

---

53. *Loretto* underlies the Supreme Court's rejection of the argument in *Nollan* that the expectations inquiry should be applied to find that the plaintiff there did not have a reasonable expectation to exclude members of the public from his beachfront property because the regulation at issue predated plaintiff's purchase. *Nollan*, 483 U.S. at 833 n. 2, 107 S.Ct. at 3147 n. 2. *Nollan*, like *Preseault*, implicated the *Loretto* physical occupation *per se* rule and the right to exclude others, rather than a restriction on land use.

of this case, that his claim involves a physical taking. Accordingly, a consideration of expectations is central to the resolution of a regulatory takings claim where a restriction on land use is at issue. Plaintiff's lack of such an expectation here is determinative of his takings claim.

## CONCLUSION

Plaintiff recognized contemporaneously with his two major investments in the property that its ecological sensitivity would make it difficult to secure development approvals from federal, state and county officials. Land development at both points in time was a highly regulated business, and plaintiff's sought uses for Sugarloaf Shores were subject to restriction or prohibition under that regulatory regime. While plaintiff was free to take the investment risks he took in this regulated environment, he cannot look to the Fifth Amendment for compensation when such speculation proves ill-taken. Based upon the undisputed facts presented, it is decided that no taking by the United States has been demonstrated here.

Accordingly, **IT IS ORDERED**, that defendant's motion for summary judgment is **GRANTED**. Plaintiff's motion for summary judgment is **DENIED**. Final judgment shall be entered dismissing the complaint with no costs to be assigned.